## L. R. JUNCTION RY. v. WOODRUFF.

1. RAILROADS: *Taking land for bridge purposes: Owner entitled to market value.*

   The owner of land taken by a railroad for a bridge site, is entitled to receive its market value at the time of its appropriation. By market value is meant the price that the owner of the land could obtain for it after taking reasonable and ample time to effect a sale.

2. SAME: *Same: Market value, how ascertained.*

   The market value of property taken for railroad purposes, is ordinarily to be proved by the opinion of witnesses; and in support of their estimates they may describe the property, giving its location, advantages and surroundings.

3. SAME: *Same: Range of testimony.*

In ascertaining the value of land taken for railroad purposes, the latitude which should be allowed the parties, in producing testimony of facts to support the estimates made by witnesses, is a matter largely in the discretion of the presiding Judge. The owner should be allowed to prove every fact which he would naturally be disposed to adduce if he were attempting to effect a private sale; and opposing counsel should be allowed to make every inquiry which one about to buy the property, would feel it to his interest to make.

4. SAME: *Same: Special value of land as a bridge site.*

In a proceeding to condemn a site for a railroad bridge, evidence to show that the land required for that purpose, possesses superior advantages as a bridge site, is admissible as affecting the question of its market value.

5. SAME: *Same: Instructions.*

In a proceeding to condemn a site for the landing of a railroad bridge, the plaintiff asked the following instructions: "That in considering the question of the value of the property, the jury will not award the owner an amount for damages based upon what the railroad company may have saved by taking the land, but will only allow as damages the amount which the owner may have been damnified by the loss of his property, and, in their estimate of loss, they may consider all the uses to which a *person* could have devoted the property." "Persons or corporations are sometimes authorized to build railroads, and take property for that purpose, and, in fixing the value of the property, the rule is. not how much the land is worth to the railroad company, or how much the railroad company will save by adopting a route over the land in controversy, but what is the value of the land to the owner, considering all the uses to which it might be devoted by him." *Held:* That these instructions were properly refused.

6. PRACTICE IN SUPREME COURT: *New trial for excessive damages.*

In a proceeding to condemn land for railroad purposes, the sole issue was as to the value of the land, and there was evidence to support the verdict of the jury. *Held:* That it was peculiarly within the province of the jury to find the value of the land, and this court, although not entirely satisfied with the evidence which supports their verdict, will not disturb it as being excessive.

APPEAL from *Lonoke* Circuit Court.
F. T. VAUGHAN, Judge.

*John McClure* for appellant.

1. We contend that, having a special right under the laws of Arkansas to construct the road which we have constructed,

and of erecting said bridge, and the defendants not having shown *any such, or similar right*, that the defendant cannot have damages, *based upon a use to which they could not have put the property*, but only for being deprived of the right to devote the property to such uses *as the law allows them to devote it to.*

The cases in *41 Ark., 202*, and *98 U. S., 403*, illustrate our contention, that damages cannot be awarded the owner of property, based upon its availability for uses, to which he, or others, without a grant of franchise, could not devote it.    The true rule is laid down in *9 Hun., 104.*   See, also, *11 Rich.* (*S. C.*), *239; 12 id., 509; 5 Nev., 358; 33 Ohio St., 434; 22 Hun., 176.*

Appellees made no attempt to prove the general or market value of the lot, but confined themselves to proving the *special* value "for bridge purposes."   The true rule is found in *1 Swan* (*Tenn.*), *439.*   Also, *35 Cal., 247; 6 N. Y, 522.*

2.   Appellees were not entitled to damages, for being deprived of their property, upon a basis of valuation and uses, to which they, or other individuals, could not devote it.   Authorities *sup.*

3.   The damages are excessive.

*Collins & Balch* for appellees.

In determining the value of land taken for public purposes, the *same considerations are to be regarded as in a sale between private parties.*   The inquiry is, what is the *market value*, viewed not merely with reference to the uses to which it is at the time applied, but with reference to the uses to which it is plainly adapted, etc.   *41 Ark., 208; 98 U. S., 403.*

Our theory is that appellees' property is a fractional block on the river front of the city of Little Rock, a prosperous and growing city.   That, by the decrees of Providence, it has been

placed so as to form the landing place for crossing that stream by the commerce of the surrounding country north and south. That it is far to be preferred over any and all other points upon the river front of such city.    That the entire property, unlike other points upon said river front, is of solid rock—as solid and everlasting as the foundations of the world.    That this rock juts out fully 150 feet into the river and actually presents ready made and without cost to any company, corporation, firm or individual who might desire to build a bridge to said city, that length (150 ft.) of bridge all ready for use and free for all time from expense for renewal or repair which at any other point would have to be built and maintained.    That the channel of the Arkansas river is at that point in such relation to the bluff and the wharf landing of the city as to admit of a far more economical, convenient and safe draw to any bridge to be built than at any other point upon the river front.    That fractional block 145 is within three blocks of the business center, a fact tending both to enhance its value for general as well as for bridge purposes.    That the means of exit from the city without great expense is far to be preferred over every other point, a circumstance also naturally calculated to effect its value for ordinary business as well as for bridge purposes; and, with all these, our theory is, that the jury had to deal not as a *rule* or *measure* of damages, or to ascertain, as such rule or measure, what the company may have *saved*, but as considerations and circumstances, among others, that might and should, in justice, be looked to in ascertaining the present value of the property. Not to fix and determine it, but for the purpose of giving the property the reasonable advantage of all the facts and circumstances in its favor and calculated to give it a present value which it could not have if no such advantages existed.

Review the cases cited by appellant's counsel, and argue that he has misconstrued their purport, or, if not, they are opposed to the doctrine in *41 Ark., 208.*

That our theory is correct, and that in determining the *market value*, the jury may consider the adaptability and availability of the property to be taken for uses to which it is to be applied. See *Mills Em. Dom.*, *173; 112 Mass.*, *181; 19 Wend.*, *678; 17 id.*, *649; 111 Mass.*, *125; 12 Coush.*, *605; 125 Mass.*, *34; 46 Penn.*, *520; 53 Ga.*, *178; 9 id.*, *359; 17 id , 30; 6 id.*, *140.*

*U. M. & G. B. Rose* also for appellees.

In ascertaining the market value of this property, it was certainly allowable and just that the owners should show its value and eligibility and availability as a bridge site. *41 Ark.*, *208; 98 U. S.*, *403.* The fact that the owners had no license to run a ferry or grant to build a bridge cuts no figure. They could easily have obtained either. *Mansf. Dig.*, *5420, 5546.* There is no monopoly in organizing or owning railroads in this State. *Const., art. 17, sec. 1.*

The equality of all persons before the law is recognized, and is to remain forever inviolate. *Id., art. 11, sec. 3.*

And no monopolies are allowed. *Id., sec. 19.*

A bridge site is not different from a mill site, or any other thing that may render a piece of land exceptionally valuable. If the owner cannot utilize it alone, he may associate others with him, or he may sell it, or he may keep it until he is paid the real and true value for it, unless he is willing to give it away or sell it for less. The right of property is before and higher than any constitutional sanction, and private property shall not be taken for public use without just compensation therefor. *Id., art. 2, sec. 22.*

It is said that the defendants could not use this property as a bridge site. This is obviously not true. They were laboring under no incapacity for organizing a railroad company as far as shown. The corporators of the appellant organized such a

company, and it does not appear that they encountered any special difficulty in doing so.

But even if the propositions asserted were true, it would afford no reason why the appellant should have the property for less than it is worth. A lot of grouud in a city or near a watering place may be exceptionally valuable as a hotel site, and its value is in nowise affected by the consideration that no hotel has ever been built upon it, and that the owner has never obtained a license to keep a hotel.

We are not aware of any principle of law to the effect that if one owns property that he is not able to utilize in a particular manner at any given time, another having more means, or better opportunities, may seize it; and that, under such circumstances, its value is to be reduced on account of the fact that the owner is not in a condition to make that particular use of it. This would be to get property without just compensation.

Counsel for appellant evidently labor under a delusion in saying, that although this property is a natural bridge site, peculiarly adapted for that purpose, situated where bridges must, in the nature of things, soon be required, yet that that fact cannot be shown by testimony as to its specific qualities, and its comparative advantages with other places near by; and that the appellant has such peculiar facilities for using the property for bridge purposes that it should not pay full value for it. The propositions laid down in *41 Ark.*, *207; 98 U. S.*, *409*, and *9 Ga.*, *359; 17 id.*, *30*, are unanswerable.

The New York decisions cited by counsel·are not the law of that State, and have been overruled. *17 Wend.*, *670; 27 Hun.*, *120*. The other cases are not in point. The law of Ohio is in harmony with our views. *30 Ohio St.*, *111*. See also *2 Q. B.*, *630*.

Two juries have passed on this case, and the verdict is not excessive.

*John McClure* in reply.

Cites *31 Minn., 297; Stinson v. R. Co.; 27 id., 2841,* as supporting his theory.

*27 Hun., 120,* does not overrule *9 Hun., 104,* and *22 id., 176,* but distinguishes and approves them.

McCAIN, Sp. J. This is a proceeding to condemn a site for the landing and approaches of a railroad bridge across the Arkansas river, at Little Rock. The land sought to be condemned embraces what is known in the vicinity as the Point of Rocks. This is a sort of promontory that makes out into the river, and seems to have been somewhat inviting as a bridge site. The only issue in the court below was as to the value of the property. The estimates of the witnesses ran all the way from $1500 to $50,000. The jury fixed the value at $20,000. The railroad company appealed. It is contended that the court below erred in admitting incompetent testimony, in refusing certain instructions asked by appellant, in giving an instruction asked by appellees against the objection of appellant, and also in refusing to set aside the verdict as being excessive and contrary to the evidence.

The Constitution of this State declares "all railroads to be public highways." *Art. 17, sec. 1.*

For the construction of these highways "the State's ancient right of eminent domain is conceded." *Art. 2, sec. 23.*

The owner of the property taken under this right is entitled to "full compensation." *Art. 12, sec. 9.*

The title to land is always held upon the implied condition that it will be surrendered to the government when the public necessities demand and when full compensation has been tendered. The taking of property under this power has very properly been called a "compulsory purchase." In this regard it bears a striking analogy to the King's ancient prerogative of

purveyance, which was recognized and regulated by the 28th section of Magna Charta. Under that prerogative the King was allowed to take certain personal property of the subject when his convenience and necessity demanded, but the same was not to be taken without paying the fair value to the owner. *1 Blackstone Com., 287.*

In taking property under this power of eminent domain for railroad purposes, it has been the policy and practice to proceed in the name and through the instrumentality of a corporation. The wisdom of this policy has been questioned, but its legality is beyond controversy. It is none the less therefore a taking for and on behalf of the State, notwithstanding it may be done in the name of a corporation.

1. RAILROADS: Taking land for bridge site: Owner entitled to market value.

What is the measure of compensation which the citizen is entitled to demand for his property when thus taken? We think the general concurrence of authority is that the true measure is the market value of the property. Mr. Cooley says: " The principle upon which the damages are to be assessed is always an important consideration in these cases ; and the circumstances of different appropriations are sometimes so peculiar that it has been found somewhat difficult to establish a rule that shall always be just and equitable. If the whole of a man's estate is taken, there can generally be little difficulty in fixing upon the measure of compensation ; for it is apparent that in such cases he ought to have the whole market value of his premises, and he cannot reasonably demand more. The question is reduced to one of market value, to be determined upon the testimony of those who have knowledge upon that subject, or whose business or experience entitles their opinions to weight." *Cooley Const. Lim., 565.*

In *Boom Co. v. Patterson, 98 U. S., 403,* the court say : " The inquiry in such cases must be what is the property worth in the market, viewed not merely with reference to the uses to

which it is at the time applied, but with reference to the uses to which it is plainly adapted."

A frequent source of confusion in cases of condemnation is that property sometimes seems to have a value other than and different from its market value. Bouvier, in his definition of value, says: "This term has two different meanings. It sometimes expresses the utility of an object and sometimes the power of purchasing other goods with it. The first may be called the value in use, the latter value in exchange." Webster recognizes a difference between "intrinsic" and "exchangeable" value. Webster's Dictionary, "Value." We also read in the law books of the *pretium affectionis* which sometimes attaches to property and is recognized by the courts. This theory that property may have more than one value does not go, however, without dispute. Judge LUMPKIN, in *Harrison v. Young, 9 Ga., 359,* says that "the value of land or anything else is the price it will bring in the market." Whether this theory of different values is well or ill-founded, we think that every one who has had experience in trying condemnation cases will corroborate us in saying that such an idea obtains to a great extent among those who are called to testify as to the value of property. Many witnesses are never prepared to answer as to the value of property until they first inquire the purpose for which it is to be valued. We find illustrations of this by looking into the record of the testimony in this case.

There are authorities which hold that the land owner is not restricted to the market value of the property. Such a doctrine is announced in *Robb v. Turnpike Co., 3 Metc. (Ky.), 117,* where the owner was allowed to recover more than the market value of the property. We think, however, that these cases are exceptional and that the general current is the other way.

If anything were wanting to satisfy us as to the correctness of the rule as we have announced it, it is supplied by the con-

currence on this point of the distinguished counsel who are arrayed against each other in this case.    The following instruction seems to have been given by his Honor the Circuit Judge with the approval of counsel on both sides :

"2.   The owner is entitled not simply to such sum as the property would bring at forced sale, but to such sum as the property is worth in the market—that is, to persons generally, and in ascertaining the value it is not proper to add a value to the land because the land is indispensable or necessary to the railroad company."

Other instructions substantially to the same effect were given either by the court on its own motion or at the request of the parties and without objection.

Since then, the market value is the criterion of damages, we are led to inquire what is the market value ?   The word market conveys the idea of selling and the market value, it would seem to follow, is the selling value.   It is the price which an article will bring when offered for sale in the market. It is the highest price which those having the ability and the occasion to buy are willing to pay.   The owner in parting with his property to the State is entitled to receive just such an amount as he could obtain if he were to go upon the market and offer the property for sale.   To give him more than this would be to give him more than the market value and to give him less would not be full compensation.   Of course, real estate is not like cotton, grain and other commercial products. It cannot be sold upon an hour's notice.   To sell land at its market value sometimes requires effort and negotiation for some weeks or even for some months.   And when we say that the owner is entitled to receive the price for which he could sell the property, we do not mean the price he would realize at a forced sale upon short notice, but the price that he could obtain after reasonable and ample time such as would ordinarily be taken by an owner to make sale of like property.

L. R. Junction Ry. v. Woodruff.

Yet it must be the amount which could have been obtained for the property with reference to the market value at the time of its appropriation. One who anticipates an increase in the value of his property may feel it a hardship to surrender it without receiving more than, its present market value, but it would be a hopeless task to either measure or satisfy the anticipations of a sanguine land owner. If the market value is the price for which the property could be sold on the market, we are next led to inquire, how is the market value to be proven? This is usually done by calling witnesses who are familiar with the property and asking their opinion as to such value. Here is one of the recognized exceptions to the general rule that witnesses are to state facts and not to express opinions. When the witness has made his estimate as to the market value of the property, it is competent to support his estimate by having him describe the property, giving its location, advantages and surroundings, though ordinarily this would be uncalled for unless his estimate was attacked on his cross-examination; in which case the party introducing him would have ample opportunity to rebut any facts which might appear to be derogatory to his estimate. How much latitude should be allowed the parties in the way of bringing out in the testimony collateral, or perhaps we should say cumulative facts, to support the estimates made by witnesses, is a matter that must be·left very largely to the discretion of the presiding Judge. We would not undertake to fix the limits of a discretion so necessary to be exercised. We deem it proper, however, to say that the presiding Judge should not suffer collateral issues to spring up and multiply, or the jury to be taxed with facts and figures which could throw no appreciable light upon the question in hand, namely, the ascertainment of the market value of the property. As a general guide to the range which the testimony should be allowed to assume, we think it safe to say that the land owner should be allowed to

2. SAME: Same· Market value, how ascertained.

3. SAME: Same: Range of testimony.

L. R. Junction Ry. v. Woodruff.

state and have his witnesses to state every fact concerning the property which he would naturally be disposed to adduce in order to place it in an advantageous light if he were attempting to negotiate a sale of it to a private individual. On the other hand the jury and the opposing counsel, for the information of the jury, should be allowed to make every inquiry touching the property which one about to buy it would feel it to his interest to make. This is only another way of stating the rule laid down, as follows, in *Boom Co. v. Patterson, supra:* "In determining the value of land appropriated for public purposes the same considerations are to be regarded as in a sale of property between private parties."

4. SAME: Sam.: Special value of land, as bridge site.

Taking this rule as a line of departure we proceed to determine the point—we may say the only point—which counsel have made the subject of controversy in their briefs; that is to say, whether it was competent for appellees to adduce evidence to show the value and advantages which the Point of Rocks possessed as a bridge site. The counsel for appellant contends that the fact that the Point of Rocks constitutes an eligible bridge site is not properly admissible as an element of value in this case. But inasmuch as the counsel each accuse the other of misstating his contention, it will perhaps be safest to allow the counsel for appellant to state his position in his own way. We accordingly quote from his brief as follows:

"We contend that, having a special right under the laws of Arkansas to construct the road which we have constructed, and of erecting said bridge, and the defendants not having shown *any such, or similar right*, that the defendants cannot have damages *based upon a use to which they could not not have put the property*, but only for being deprived of the right to devote the property to such uses *as the law allows them to devote it to.*"

"If Woodruff did not have the right to bridge the Arkansas, he has not been deprived of anything but his land."

This is asking us to put fetters on the market value, if it is not a proposition to discard it as a criterion of damages altogether.

It can hardly be doubted that if Woodruff had gone upon the market to sell this property he would not have concealed the fact that it possessd superior advantages as a bridge site. Now, if he would not have concealed it from a purchaser, it would be unfair to him for the court to conceal it from the jury. On the other hand, if one had been about to purchase this property, he would hardly have been so obtuse as to overlook an element of value so obvious as its eligibility for a bridge site. Railroad and bridge companies do not condemn all the land they make use of in their location. The amount they obtain in this way constitutes perhaps a small per cent of what they utilize. They are frequently in the market as purchasers, and they are sometimes in a position to dictate very favorable terms. We think the probable demand that there may be for suburban land for depot and bridge sites, is a recognized factor in the market value of property in some cases. All that lends value to anything that we possess is the fact that other people want it, and are willing to pay the money to get it. If it were announced that a point of rocks on the Mississippi River, at Hopefield, opposite Memphis, was offered for sale upon the market, it is easy to predict that there would be no lack of bidders, and that the price offered would be very much above what the property would be "worth as a piece of land." In their anxiety to secure property so valuable, bidders would hardly delay until they had obtained authority to build a bridge.

Of course it does not follow that because a particular spot of ground constitutes a good bridge site, that it therefore has great market value. There may be no reasonable probability that any one will ever want to build a bridge at that point. This probability is an essential condition of value in such cases.

L. R. Junction Ry. v. Woodruff.

If the market value of the property is the true criterion of damage in these cases, it also follows that the uses to which the owner might apply the property is a matter of no significance. When we go to buy property for purposes of our own, the use to which the vendor has applied it, or could apply it, is a matter of secondary consideration. If instead of its salable value, the owner was entitled to recover for his property only what Bouvier calls its "value in use," then the utility of the property to the owner would become an all important inquiry. But this, as we have shown, is not the criterion.

The counsel for appellant cites very respectable authority to support his contention, but the decisions cited are in direct conflict with the more authoritative cases of *Boom Co. v. Patterson, supra,* and *R. R. v. McGehee, 41 Ark., 207.* To these cases we adhere, understanding them, as we do, to go no further than to hold that the owner may be allowed to show every advantage that his property possesses, present and prospective, in order that the jury may satisfactorily determine what price it could be sold for upon the market.

5. SAME:
Same: Instructions.

The instructions asked by appellant and refused by the court, were as follows:

"No. 3. That in considering the question of the value of the property, the jury will not award the owner an amount for damages based upon what the railroad company may have saved by taking the land, but will only allow as damages the amount which the owner may have been damnified by the loss of his property, and in their estimate of loss, they may consider all the uses to which a *person* could have devoted the property."

"No. 4. Persons or corporations are sometimes authorized to build railroads and take property for that purpose, and in fixing the value of the property, the rule is, not how much is the land worth to the railroad company, or how much the railroad company will save by adopting a route over the land in

controversy, but what is the value of the land to the owner, considering all the uses to which it might be devoted by him."

These instructions antagonize, as they were evidently intended to do, the doctrine which we have announced. By italicizing the word "person," in the first of these instructions, its obnoxiousness which would not otherwise have been readily detected, is made apparent. In determining the market value of land we must not restrict ourselves to what *persons*, as distinguished from corporations, would pay for it. Both have the right to buy, and the possibility of their doing so should be considered. The refusal to give these instructions meets our approval, as does also the giving of appellees' instruction objected to by appellant.

It seems to us that counsel for appellant magnifies the difficulty and overrates the importance of obtaining and owning a bridge franchise. Whatever may be the case elsewhere, so far as Arkansas is concerned, perhaps the easiest and cheapest part of building a bridge, or a railroad, is obtaining the charter. The most difficult things to obtain are the money with which to build and a rock upon which to land. To obtain charters and sit down with them in the pathway of advancing improvements has been a favorite way of making money by those who are enterprising but impecunious. This practice has been regarded as somewhat disreputable, but we think no one could criticize the owner of a bridge site for demanding all that he could probably realize from any one who might desire to purchase or utilize his property.

One or more witnesses for appellees were asked to give the comparative cost of building bridges at different points along the river front above and below the Point of Rocks, or rather to state the difference in such cost. The witnesses were also asked, "What is the value of the property for bridge purposes?" It would have been less misleading to have asked, "What would be saved by building a bridge at this point as compared with

other points below or above?" or, "What were the pecuniary advantages offered by this point for building a bridge?" It is very apparent, however, from the argument that the objection taken by counsel is not the objection which we take to this interrogatory. He objects to any and all testimony about a bridge site, while we only criticize because we are disposed to suspect that counsel for appellees introduced the word "value" in this connection as a sort of covering for the rather scant testimony with which their case was clothed. In fact if there had been an ample supply of direct testimony as to the market value, we cannot say that the form of this interrogatory would have called for any animadversion. We think, however, that if any mistaken impression was made upon the minds of the jury by this method of examination, it was effectually removed by the emphatic and repeated injunctions contained in the instructions, to the effect that the market value should be considered by the jury as the aim and end of their verdict.

6. PRACTICE IN SUPREME COURT: New trial for excessive damages.

Not being able to put our finger upon any error in the ruling of the court, we are asked to review the verdict upon the testimony. This is a delicate duty in any case, and especially so in a case where the sole issue is one as to value. This is so peculiarly within the province of the jury; it is a matter in which we can act with so little intelligence or satisfaction; and there is so little of finality about any judgment we could render on this point, that nothing but an extreme case would justify our interference. If there was no evidence to support the verdict, we would not hesitate to exert our authority to set it aside. It must be very seldom, however, that the verdict is entirely unsupported by evidence in a case where there is but a single and simple issue submitted to the jury, as in this class of cases. The evidence is not entirely satisfactory to us, and yet we think it fairly conduces to show that the principal thing which lent value to the Point of Rocks was its eligibility as a bridge site and that it had been somewhat coveted for this pur-

pose. If its principal value consisted in its advantages for bridge purposes, it can hardly be claimed that the jury went beyond the estimates of the witnesses.

As long as witnesses differ so widely in their opinions as to values, and as long as litigants measure values so entirely by the standard of self-interest, we cannot hope for verdicts that shall be satisfactory to both parties. The utmost to which we can hope to attain is to sometimes reach a verdict that is unsatisfactory to both parties. This very happy consummation seems to have been accomplished by the first verdict of $10,000 in this case The fact that both parties asked to have it set aside was a most potent reason for letting it stand. The counsel for appellant sincerely feels, no doubt, that we would be doing his client the greatest good to set aside this second verdict. The verdict, we must confess, does some violence to our own judgment in the matter, yet we are not at all persuaded that appellant would fare better on another trial, and there must be an end to litigation sometime. We conclude, therefore, to end the present contention by affirming the judgment below.

COCKRILL, C. J., did not sit in this case.