I cannot concur in the foregoing opinion. There is undisputed evidence or there are findings of the tax appeal court in the case to the following effect: The tract of which the land in question once formed a part extended across what is now Ala Moana and included a triangular piece of land on the mauka side of the road. It was leased about the year 1881 at a nominal rental to the government by Princess Ruth Keelikolani, the then owner, and came to the Bishop estate subject to that lease which expired in March, 1931. During a portion of the tenancy a marine railway was operated there by Sorenson Lyle but that use was discontinued sometime between 1914 and 1917, since which time the land has been, with negligible exceptions, *Page 161 
unproductive, vacant and unimproved. Until the expiration of the government lease the land was exempt from taxation. Thereafter, as of January 1, 1932, the taxpayer, for assessment purposes, returned the land in question, which is the portion of said tract situated on the makai side of Ala Moana, at $37,164. The owner's valuation was raised by the tax assessor to $196,059 and from that latter assessment the taxpayer appealed to the territorial board of equalization. The board of equalization in its written decision (Exhibit D), dated December 30, 1932, said in part: "This board is of the opinion that, since the land directly opposite the former marine railway site was assessed as of January 1, 1932, at $1.00 per square foot, less 20% for the street frontage to a depth of 100 feet; and since convincing evidence was produced by the taxpayer supporting its contention that for the former marine railway site to have a harbor frontage value was only a remote possibility; the former marine railway site should be classed with and assessed the same as the land directly opposite," upon which finding the board of equalization then fixed the valuation of said makai lot as of the assessment date at $43,006.
Since the lease expired in 1931 the trustees have tried to sell this land to the government and to others without success. Witnesses testified without contradiction that there has been no increase in value of this lot since January 1, 1932; that there has been no general appreciation in the value of local real estate during the year, and that if there has been any change in the value of real property in this Territory it has been a change downward. One qualified witness testified that the facilities of the harbor at the present time and for many years to come are entirely adequate and that the possibility of the Bishop estate lot being required for harbor development is exceedingly remote; that the lot in and of itself is too small for development *Page 162 
and could properly be developed only in connection with the adjacent properties of the Inter-Island company, the United States engineers' base and the Department of Commerce lighthouse pier; that the lot in question is neither long enough nor wide enough to be developed for dock purposes, and that the improvement and development of it by a private owner for such purposes would be entirely impracticable.
In the foregoing circumstances, considered in connection with other facts set forth in the majority opinion, controlling importance should not be attached to the fact that experts employed by the trustees and who were members of the territorial appraisal board, in December, 1930, prior to the former appeal, appraised this lot at $367,611.75, or that since then, on December 2, 1932, the same appraisers had placed a valuation thereon of $220,567, or that on May 1, 1931, the trustees had offered the property to the board of harbor commissioners at the earlier valuation.
The undisputed evidence shows that the two valuations last above referred to were based upon the theory that the lot had special value because of its harbor frontage. The location of the lot under the specific provisions of the statute was a factor properly to be considered by the assessor in making his assessment; but it was only one of the many factors required to be taken into account and each factor, considered with the others, was important only as it bore "fairly and reasonably" upon the question of "value," as that term is legally defined. If under the peculiar circumstances of the case the lot had no added value because of its harbor frontage and was valuable only as industrial property that fact and the fact of its appraisement under the latter classification, at $45,525, were factors, equally with others, entitled to consideration under the statute.
The opinion of the majority says: "The fact that the taxpayers fixed a selling price upon the property prior to *Page 163 
the taxation date has in our opinion important bearing upon the question of value." The recital refers to the trustees' offer of May 11, 1931, to sell the property to the Territory or to the harbor commissioners at the then recently appraised value of $367,611.75; but this offer should be considered, if at all, only in connection with the undisputed fact mentioned by the majority, that it was promptly rejected by the board of harbor commissioners, and with the testimony of Mr. Bigelow, chairman of the board, that "I think it is very advantageous to the Territory, around fifty thousand" (Tr. p. 213), together with all the other qualifying circumstances in the case. If the facts last above recited are entitled to consideration under the blanket provision of section 26, Act 40, L. 1932, that consideration shall be given to the specific conditions named "and further to all other influences whether similar to those listed or not," then the consideration of such other influences is not unrestricted but is expressly tied down, as is consideration of the influences specifically listed, to the primary question of "value" with the further qualification that such value shall be "fair and reasonable." Section 21, Act 40, L. 1932, provides in part and in effect that real property in this Territory shall be subject to a tax determined in the manner provided by law "upon its fair and reasonable value," and section 26, hereinabove quoted, provides for the consideration of "other influences" therein referred to only where such other influences "fairly and reasonably bear upon the question of value." A consideration therefore of the meaning of the term "value" is inescapable.
Bouvier defines "value" as "The utility of an object. The worth of an object in purchasing other goods. The first may be called value in use; the latter, value in exchange. When applied without qualification to property of any description" it "necessarily means the price which *Page 164 
it will command in the market," citing Fox v. Phelps, 17 Wend. 399. To the same effect are Little Rock Junction Railway
v. Woodruff, 5 S.W. 792, 795, 49 Ark. 381, 4 Am. St. Rep. 51;In re McGhee's Estate, 74 N.W. 695, 697, 105 Ia. 9; San DiegoLand and Town Co. v. Neale, 20 P. 372, 374, 78 Cal. 63, 3 L.R.A. 83.
"By `value,' in common parlance, is meant `market value,' which is no other than the fair value of property as between one who wants to purchase and another who desires to sell." Hetland v.Bilstad, 118 N.W. 422, 423, 140 Ia. 411. See also Mo. K. T.Ry. Co. of Texas v. Crews, 120 S.W. 1110, 1111. "Value" of property in proportion to which property must be taxed under Const. Art. 8, § 1, means the reasonable cash market value thereof. Rowland v. City of Tyler (Tex.), 5 S.W.2d 756, 760. "The words `value' and `market value' are commonly used interchangeably as equivalents of actual value in such case, and `no market value' means nothing of value." Anderson v.Frischkorn Real Est. Co., 235 N.W. 894, 253 Mich. 668. The terms "fair valuation" and "reasonable value" have also been given judicial definition thus: "Fair valuation," in Bankr. Act § 1, 30 Stat. 544 "means such a price as a capable and diligent business man could presently obtain for the property after conferring with those accustomed to buy such property." Stern
v. Paper, 183 Fed. 228, 231. "Reasonable value," "fair cash value" and "actual cash value" are practically synonymous terms and mean the fair and reasonable cash price for which the property can be sold on the market. Montesano Lumber Mfg. Co.
v. Portland Iron Works, 186 P. 428, 432, 94 Ore. 677. See also Groebel v. Betz (Mo.), 38 S.W.2d 289, 291.
The foregoing definitions seem to be sustained by the weight of authority. See Words Phrases 1st, 2d, 3d and 4th Ser., defining the terms "value," "reasonable value" and "fair value." *Page 165 
"But not always is there a market value for an article. In such a case the value is the probable exchangeable rate, so far as one can estimate it from the various attendant circumstances and conditions which would affect the disposal of the article." 1 Wig. Ev. § 717.
Adopting the foregoing definitions I concur with the majority that "the expressions `full cash value' and `fair and reasonable value' are terms of like import and denote the price in cash which a capable and diligent man could obtain for" the property "as distinguished from the sacrifice price on the one hand and the credit price on the other." Thus the earlier definitions of the term "full cash value" used in the former statute as set forth in the Hawaiian decisions cited by the majority are applicable to the expression "fair and reasonable value" used in the new enactment. It does not appear that the tax appeal court in making its finding of "value" attached to that term the meaning "cash value" set forth in the foregoing definitions and adopted in both the majority and minority opinions herein. With this fact and these definitions in mind I cannot concur in the majority view that there was sufficient evidence before the tax appeal court to support that court's valuation of the land for taxation purposes at $101,398.75. There was no evidence that it had a cash value approximating $101,398.75. There was no evidence that the land could be sold for that amount, or made productive of income which could be capitalized at that amount, or exchanged for other property of that valuation. It is true that a witness for the taxpayer, on cross-examination, when asked, in comparing the values of potential income-bearing lots, "Assuming that the possibility of leasing both properties were approximately the same chance, do you think that an exchange of this property for this other property would be a fair and reasonable exchange?" replied, "No, I don't," and replied further that he thought the Bishop *Page 166 
estate property would be the better, "the fact that it is on the harbor is inescapable." (Tr. p. 129.) But the witness's answer was based upon pure hypothesis and not upon proof. Freed from the assumption above expressed the same witness testified as follows: "The water front potentialities of this lot would be considered by any one considering the valuation of the property. The principal factor, however, in connection with the extent to which such consideration should apply, would be the probability of its being put to so-called harbor development purposes, and I believe that you cannot escape the fact that this lot is on the harbor, and some appraisers, I can see, might easily take the position that its probable value for water front or harbor development purposes, at some estimated time in the remote future, should be discounted to the present day as one method of arriving at a fair and reasonable value. However, that discount would be so heavy that, in my opinion, the industrial consideration would probably control it." (Tr. p. 128.) The same witness elsewhere (Tr. pp. 104, 105) expressed the opinion that the fair value of the property would be upon "an industrial lease basis."
For the reasons above set forth I think that the decision of the tax appeal court should be reversed. *Page 167