## ARKANSAS POWER & LIGHT COMPANY v.
## MRS. DOVIE S. CHILDERS

5-6135                                      489 S.W. 2d 776

Opinion delivered February 5, 1973

*House, Holmes & Jewell,* by: *Robert L. Robinson Jr.,* for appellant.

*John S. Gibson* and *Charles S. Gibson,* for appellee.

CARLETON HARRIS, Chief Justice. Appellant, Arkansas Power & Light Company, in January, 1971, condemned 8.09 acres of land belonging to Dovie Childers, appellee herein, 7.11 acres to be used for a substation site, and the remaining .98 acre for a road easement to the substation. The tract of land belonging to appellee consists of approximately 35 acres, the tract being divided into an east and west tract, the east tract consisting of 18.17 acres. It is from this tract that the appellant condemned the acreage sought and it is only the value of this tract that is involved. The substation site sits adjacent to a previously existing 2.37 acre substation site that was purchased from the Childers in the 1920's. On trial, the jury awarded Mrs. Childers $19,000, and from the judgment

so entered, appellant brings this appeal. For reversal, three points are relied upon which we proceed to discuss in the order listed.

### 1.

"When a subdivision is not in being at the time property is condemned, or for that matter at the time of trial, admission of an unrecorded hand-drawn plat of non-existent lots and streets on the property for the purpose of showing how it could be developed and how it is damaged results in prejudicial error because the evidence is misleading, speculative, and cannot be properly explained to the jury without bringing in a host of collateral issues."

At the time of the condemnation, the property was vacant pasture land. Phillip T. Sherland of McGehee, engaged in the insurance and real estate business, testified on behalf of appellee, and in endeavoring to demonstrate alleged severance damages to the remainder of the tract, used an unrecorded hand-drawn plat of the remainder which depicted non-existent lots and streets. In the opinion of Mr. Sherland, the highest and best use of the remaining acreage was for residential development, and the purpose of the testimony was to demonstrate the diminished value of the remaining land by the location of the access road, i.e., appellee was showing how the land could be divided and be used if the road did not exist. Several cases are cited by appellant in support of its argument, but there is a distinction in those cases and the matter at hand, for in all cases relied upon by appellant involving lot and block plats of subdivisions not in being at the time of trial, there was testimony by the witnesses, in the introduction of the plats, *as to the value* of each lot depicted upon the plats offered. The present situation is comparable to that existing in *Arkansas State Highway Commission* v. *Kaufman,* 244 Ark. 1136, 428 S.W. 2d 251, where a diagram reflecting how the 123 acre site could have been used, except for the condemnation, was offered into evidence. The commission objected for the same reasons as those mentioned herein by appellant, but this court held the testimony admissible, stating:

"The exclusionary principle underlying those decisions has no application here. Kaufman's drawing was not intended as a basis for the assignment of values to the various enclosures that were sketched. Those enclosures were nearly all mere spaces defined by lines that represented fences. The sole purpose of the diagram was to enable the jury to see how the rectangular 123-acre parcel could be used as a site for the ranch headquarters. That the witness admitted that the site might not have been completed for as much as ten years is immaterial, because Kaufman was merely explaining *how* the site could be used."

Sherland made no attempt to testify as to the *value* of any lot shown upon the plat and he also stated that the plat should not be considered as the ultimate end for which the property could be used. While some figures giving the value of the lots appeared in handwriting at the top of the exhibit, there is no showing that these figures were on the plat when it was offered into evidence, or by whom the notations were made. Certainly, Sherland did not testify as to the value of the purported lots reflected in the exhibit, nor does appellant make any argument relating to these figures. The court did not err in permitting the introduction of this exhibit.

## II.

"The lower court, over appellant's specific objection, erred in permitting appellee's value witness to state the sales prices of other lands in the vicinity without explaining the similarity and comparability, if any, of the lands sold, to the property condemned."

The testimony referred to was not given on direct examination but was given on re-direct examination after counsel for appellant had cross-examined Sherland in an effort to show that this expert witness was not familiar with land sales in the vicinity.[1] On re-direct

---

[1]From the record:

MR. TRIMBLE:
"Q. How many pieces of property, within the last past five years, within

examination, Sherland was questioned about sales with which he was familiar and he mentioned several. Appellant objected to this testimony because Sherland was unable to show that the lands mentioned were comparable to that in litigation, and appellant contends that this evidence should not have been admitted. Let it be remembered, however, that appellant opened the subject and the sales mentioned by the witness were made as a response to appellant's suggestion that he was not familiar with the sale of any lands in the area. Sherland was not originally asked how many *comparable* pieces of property he was familiar with within five miles that had been sold, but only asked how many pieces of property. In *Arkansas State Highway Commission* v. *Pittman,* 251 Ark. 709, 473 S.W. 2d 924, this court pointed out that when one party introduces evidence which may be incompetent, he cannot complain of the introduction of the same type of evidence which is directed to the same isue by the other party. Accordingly, if the evidence had been offered solely for the purpose of showing that Sherland was familiar with land sales in the vicinity, there would be no error; however, the record reveals the following:

"OBJECTION BY ATTORNEY FOR APPELLANT:

I object again because he is showing the comparability of the land, and the use of it so far as the utility of it. None of this has been done. In order to give the value of the land, he should show this and compare the two as well as possible."

"ATTORNEY FOR APPELLEE:

Your Honor, we would like to show the price of the land transactions here in Monticello, and let the jury use their own opinions to compare this land to the lands that were bought."

two miles, or even within five miles of this property, do you actually know the one or both of the buyers or sellers and the sale price of such property?

"A. How many? May I look at my notes?

"Q. Yes, Sir. Tell us how many pieces of property, and do you know the buyer or seller of the property within five miles of this litigation or property involved in this litigation?"

The evidence was not admissible for this purpose for it was not within the province of the members of the jury to use their own opinions in comparing the land to the lands mentioned; rather, the witness was due to make the comparison and to testify as to his findings. Accordingly, the admission of the testimony constituted error.

### III.

"The lower court erred in giving instruction No. 6 requested by the appellee."

In Instruction No. 6, the court told the jury that if property is well adapted for the use to which it is being taken and the necessity for such use was so imminent as to add something to its value in the minds of property buyers, that element may be considered in estimating market value. This instruction was objected to as follows:

"The Plaintiff objects, both specifically and generally, to Court's Instruction number Six, which is Defendant's requested Instruction Number Three, for reason that there is no evidence showing that this is property peculiar, or well adapted, to the use for which it was condemned, by the Arkansas Power and Light Company, and further, that such usage does not enter into, and should not enter into, consideration to determine what is the fair market value. This is for reason that it considers, and puts A P and L, in the position of having to pay the higher and greater value if it is in a peculiar or satisfactory location for it, and if it is a satisfactory location to it, then, they would have to pay more than fair market value for it."

We think the court erred in giving this instruction. It does appear that the property condemned was entirely suitable for the use for which it was taken, but we do not think the evidence reflects that the land was exceptionally or peculiarly adaptable for a substation. First, let us determine the law relative to this particular point. In 27 *Am Jur 2d, Eminent Domain,* § 429, we find:

"It is fundamental that the value of the land taken to the party taking it is not the test of what should be

paid, nor should the fact that the land is desired or needed for a particular public use be considered when it is taken for that use. Thus, it is generally recognized that the value of the land for the particular use for which it is sought to condemn it, or its value to the taker because of its peculiar adaptability for that use, or because of his needs and necessities, or because its strategic location makes it desirable or indispensable for his purposes, or the fact that it would cost him more to appropriate other lands for his use, or the benefits accruing to him from the land, are not tests of the compensation to which the owner is entitled in condemnation proceedings. It is the value to the owner, or loss caused to him, and not the value or gain to the condemnor, that is to be taken into consideration."

Accordingly, the test is not whether this particular location was of particular benefit to the Arkansas Power & Light Company, but the test is rather the loss caused to the property owner by virtue of the condemnation. In other words, to support the instruction given, the proof should reflect that the land itself was particularly or peculiarly adaptable for the use of any company or individual needing land for a substation. The special adaptability should be such as to add to the value of the property in the open market. This special adaptability referred to is illustrated in the case of *Gurdon & Fort Smith Railroad Co.* v. *Vaught*, 97 Ark. 234, 133 S.W. 1019. There, plaintiffs owned land through which ran a narrow pass in the mountains, known as Caddo Gap. On either side of the gap for a great distance to the east and west were high mountain ranges so that the pass constituted substantially the only practicable route for a railroad line through that section of the country. It was urged by the railroad that the court permitted the introduction of incompetent testimony relative to the value of the land, but we disagreed. A number of civil engineers, who had acted for a number of years for various railroads and having special knowledge as to the peculiar advantages of certain sites for the location of railroads and the value thereof, testified as expert witnesses upon the question of the adaptability of the land for railroad purposes. The engineers viewed the land in controversy, carefully

examined the gap and all the lands in the vicinity through which a railroad could be located along the proposed railway route. They testified to facts tending to show demand for railroad construction in that section of the country; that the gap or pass at issue was especially valuable for railroad purposes and was practically the only feasible route through the mountainous country. They then rendered their opinion relative to the fair and reasonable cash market value of the land taken. *Little Rock Junction Railray* v. *Woodruff*, 49 Ark. 381, 5 S.W. 792 involved land for a railroad bridge across the Arkansas River at Little Rock. The land embraced what was known as the "Point of Rocks". The court described the location as "a sort of promontory that makes out into the river, and seems to have been somewhat inviting as a bridge site". The question in the litigation was whether it was competent for the appellees to present evidence to show the value and advantages which the Point of Rocks possessed as a bridge site. The court held such evidence admissible, stating:

> "We think the probable demand that there may be for suburban land for depot and bridge sites, is a recognized factor in the market value of property in some cases. All that lends value to anything that we possess is the fact that other people want it, and are willing to pay the money to get it. If it were announced that a point of rocks on the Mississippi River, at Hopefield, opposite Memphis, was offered for sale upon the market, it is easy to predict that there would be no lack of bidders, and that the price offered would be very much above what the property would be 'worth as a piece of land.'. . .

> "Of course it does not follow that because a particular spot of ground constitutes a good bridge site, that it therefore has great market value. There may be no reasonable probability that any one will ever want to build a bridge at that point. This probability is an essential condition of value in such cases."

In the present case, most of the evidence relied upon relates to the value of the land to the power company rather than to the owner. For instance, Mrs. Childers

testified that there had been a substation site in existence since 1929 and the proposed substation site is adjacent thereto.[2] A Missouri Pacific Railroad right-of-way is the north boundary of the substation site and Mrs. Childers testified that, at a time when the old substation had burned, the company brought transformers in by railway and unloaded equipment at this substation site.

Mr. Sherland also said that the highest and best use of the land taken was for a substation, but this opinion seemed to be predicated upon the fact that the power company had condemned it for that purpose.[3] Again, we

---

[2] Mrs. Childers said, "There were three transformers there. Just a small place, and all of it was not enclosed by a fence."

[3] From the record:

"Q. Now, let me ask you this. What did you say the highest and best use of this land was prior to the taking back in January of 1971?

"A. The highest and best, what would I say the highest and best use was?

"Q. What was your appraisal? I mean what you stated was the highest and best use of the land east of the transmission line before 1971?

"A. The highest and best use was what it is being used for right now.

"Q. Alright, thank you. I believe that is for a pasture, isn't it?

"A. I beg your pardon?

"A. That is for a pasture, isn't it?

"A. It has got a substation on it right now.

"Q. What is the highest and best use for that piece of property on January 29, 1971?

OBJECTION BY ATTORNEY FOR APPELLEE:

"Now, he has already answered the question.

ATTORNEY FOR APPELLANT:

"This is before the substation was in there.

ATTORNEY FOR APPELLEE:

"Now, your Honor, that is what he is trying to say.

point out that the value of the property to the power company is not the proper test.

The proof should have been directed to the peculiarities of the land prior to a substation being placed on any portion, which gave it a market value, because of its location, topography, and other factors that might make it particularly valuable as a substation site to anyone who had need of land for that purpose; it thus would possess that increased value to the owner, provided there was a market for such a tract of land. We have concluded, under the evidence, the instruction was not justified.

In accordance with what has been said, the judgment is reversed, and the cause remanded to the Drew County Circuit Court for further proceedings. It is so ordered.

ATTORNEY FOR APPELLANT:

"The fact that A. P. & L. took the property does not mean that that is the highest and best use for the property.

ATTORNEY FOR APPELLEE:

"They must have thought so, because they took it.

ATTORNEY FOR APPELLANT:

"What was the highest and best use before it was taken?

ATTORNEY FOR APPELLEE:

"Your Honor, we feel since it was taken by A. P. and L. as a substation, that is the highest and best use for it.

BY THE COURT:

"He said a substation."