[Civ. No. 5285.   Third Appellate District.—July 6, 1936.]

CITY OF REDDING (a Municipal Corporation), Respondent, v. JOHN DIESTELHORST et al., Appellants.

Jesse W. Carter, Dallas L. Barrett and Carter & Barrett for Appellants.

W. D. Tillotson, City Attorney, and L. C. Smith for Respondent.

PULLEN, P. J.—By this action in eminent domain the City of Redding, in order to cooperate with the state of California in the permanent routing of the Pacific highway

through its corporate limits, sought to take for highway and bridge purposes, a portion of the lands of defendants. This tract of land lies immediately north of and adjacent to the city limits of Redding. The highway passes through Redding over Market Street to its intersection with Riverside Drive, which runs east and west and parallel with the Sacramento River. The lands of defendants lie between Riverside Drive on the south and the Sacramento River on the north. There is a precipitous drop of approximately sixty feet from Riverside Drive to the lowlands bordering the river. The new alignment of the Pacific highway crosses Riverside Drive and continues almost directly north crossing the lands of defendants by means of a fill and bridge.

A jury awarded to appellants the sum of $7,500, of which $6,000 was for the property taken, and $1500 as severance damages.

From the final judgment based upon this award, the owners prosecuted this appeal, claiming principally as ground for appeal that the court erred in striking out the testimony of two of their witnesses, Dozier and Phillips, as to the market value for bridge site purposes of the property here involved, upon the ground said testimony was speculative, remote and conjectural. Respondent conceded the property in question was valuable for bridge site purposes and is adapted to the construction of a bridge and its approaches, but contended the location of the bridge is purely incidental to the construction of the highway and that appellants failed to prove any value for bridge site purposes except for use in connection with the state of California.

The testimony with which this appeal is concerned is that of Charles T. Dozier and J. W. Phillips, whose qualifications as civil engineers were admitted. Mr. Dozier in addition to his work as a civil engineer, was resident engineer for the construction of a bridge across the Sacramento River just north of Redding, and crossing the lands of appellants herein, constructed several years ago. This witness, after testifying that he had been familiar with the lands of defendants for over twenty-five years and had prepared various maps of the lands in question, was asked the following questions by Mr. Carter:

" . . . Mr. Dozier, from your familiarity with the lands of the defendants John Diestelhorst and wife involved in this action, particularly the portions of the land which the city of Redding seeks to condemn in this action, to what purpose would you say those lands were best adapted? . . . A. The best purpose, the best use, that could be made of those is for a bridge landing, approach to a bridge. . . . Q. What are the features of the Diestelhorst property involved in this action that makes it adaptable to the purpose for which you have mentioned? A. The presence of a broad foreground in front of the high bank separating the high elevation of the bank from the actual water course which allows the descending to the level of the opposite side of the river. Each bridge setup of course has features peculiar to itself. In this case there is a high bank on the side and a low broad bank on the opposite side. The bridge, necessarily, for economic reasons, must be on an incline, the purpose being to get down. The bank is sixty odd feet high there to a bank that there is ten or fifteen feet high. If the river ran immediately at the foot of the steep bank there would be no opportunity to get down. The bridge must commence at the top of the bank itself. There is no opportunity for a fill approach. The actual structure with the open archways, whatever type, at least the opening into the bridge must commence at the top of the bank, but in this case there is a broad expanse of level ground below the top of the bank before you reach the actual waterway, which must be allowed to remain open to pass the water in the river. That feature of course, is present here and makes it peculiarly adapted for the landing attachment of a bridge crossing in a southerly direction from the lowlands opposite the river to the high bank on this side. . . . Q. In your testimony thus far as to the adaptability of that land for a bridge site or the approach of a bridge, have you had in mind any particular bridge, whether a highway bridge or railroad bridge or whatnot, or is it just a site for a bridge to be used for any purpose that bridges are generally used for? A. Yes, it can be used for any bridge, any type of use. A highway construction allows of steeper grades than are ordinarily applied in railroad engineering, but that is a matter to be taken care of on the opposite side of the

river, the north end of the bridge, at sufficient elevation to accommodate a railroad grade. That has nothing to do with the south end. Attachment on the south end is satisfactory for a railroad bridge, highway, toll bridge, suspension bridge, any type of bridge. . . . Q. Mr. Dozier, are you generally familiar with the development going on in this locality? A. Yes. Q. And you are familiar with the Sacramento river in this locality, are you? A. Yes. Q. And do you know of certain contemplated developments in this locality? A. Yes. I know. Q. Would you state whether or not from your knowledge of the Sacramento river and the development going on in this section of the state and the contemplated development of the resources within this county, there is a demand for bridge sites across the Sacramento river in this locality? . . . A. Yes, I think there is. My experience, although the market for bridge sites is rather limited, that this particular case, although the demand is not very high, the Diestelhorst ranch for instance, has a dozen bridge sites, and Mr. Diestelhorst has been perhaps more fortunate than ordinary in having— . . . Q. I will ask you if you knew the market value of the lands of the defendant John Diestelhorst and wife, involved in this action, on or about the 9th day of October, 1933? . . . A. Yes. . . . Q. Now, with that understanding I will ask you what in your opinion was the market value of those lands as of October 9th, 1933, in view of all of the uses and purposes to which those lands were then adapted or could be reasonably adapted? . . . A. I will have to give a double answer to that because my understanding on the October date given, that the decision that the island was out of the question had not been made and the value of the lands including the island for bridge purposes had the market value twenty-five thousand dollars. Today with the exclusion of the island I would modify that to the sum of twenty thousand dollars.''

On cross-examination, Mr. Dozier said:

''Q. When you said contemplated development, what do you mean in Shasta county? A. Kennett Dam . . . That would create a demand for the bridge in my opinion. It would be an element in the creation of a demand. Q. What kind of a bridge would that be? A. Any kind of a bridge

that would transport traffic across the river. . . . Q. Tell me what information you have, or what you have in mind when you say that the possible construction of a railroad at this particular point,—you had in mind when you say that, the operating of cars, railroad cars propelled by steam or other power, by public utility? A. Yes, that is a possibility within range. Q. Do you know of or have you heard of any new railroad coming into Shasta county? A. Oh yes. Q. What new railroads have you heard that were coming into Shasta county? A. New alignment of railroads has been widely studied in Shasta county. . . . Southern Pacific up the canyon and Southern Pacific out east from Panorama Point. Q. You say you have heard that the Southern Pacific Company are going to build another railroad in Shasta county? A. I said realignment of railroads. Yes, I have followed these things. . . . Q. The realignment doesn't go on the Diestelhorst property at any point? A. No; now just a minute— Q. . . . Does the realignment as you have heard it to be on the Southern Pacific Railroad Company and in the event of the Coram Dam, at any point touch the property now owned by the defendant John Diestelhorst and his wife? A. Yes it does. . . . Q. Whereabouts? A. It runs—the right of way of the railroad company was cut out of the Diestelhorst ranch and now adjoins him right there. Q. Then it doesn't include this bridge site that you refer to? A. No, that is further away. . . . Q. Now, do you know the name of any of the railroad companies that you have heard of that contemplate building a railroad in the city of Redding? A. No, not in the city of Redding, if you limit it to the city of Redding, I will confine my answer to that. . . . Q. Now then, what other development do you refer besides the building of the Kennett Dam; what do you have in mind? A. The realignment of the said railway. . . . Q. Do you know of any sales for bridge purposes within the past fifteen years, crossing the Sacramento River at any point in Shasta county? A. Not within fifteen years. Q. Do you know the sale price of the bridge across the Sacramento river in the southerly part of the city of Redding, a steel bridge down there? A. No, I don't. Q. Do you know what the sale price of the land upon which there is constructed a bridge across

the Sacramento River near Anderson? A. No. . . . Q. Do you know the sale price of the land which was sold for bridge purposes for any bridge across the Sacramento river, Shasta or Tehama county, except the John Diestclhorst bridge? A. No, I don't know the particulars of any of those sales. . . . Q. Is it your testimony to the jury that you believe that it is likely that some individual, private individual, firm or corporation, would build a bridge on this site, eliminating now the project for highway purposes? A. No, I don't make any such contention as that, at all. It is not impossible but under the local set up they would be precluded. They would have to get permission from the city council I presume or the State of California to start in building highways across there. . . . Q. I will ask you again, eliminating the city of Redding and the Division of Highways, from your consideration do you know of anyone that would likely purchase that property for bridge purposes? . . . A. No, I don't. There is no going concern that I know of that could handle a bridge of that magnitude that would care to do so.''

Mr. Phillips, testifying for appellants, said:

''Q. Does the topography of the land have anything to do with the question of whether or not it is feasible or available bridge site? A. Yes, sir. Q. Are you generally familiar with the traffic conditions in the Sacramento Valley? A. Yes, sir. Q. Are you generally familiar with the development here in this section of the state? A. Yes. Q. And the proposed and prospective development? A. Yes. Q. And have you heard of prospective developments to take place in this locality in the near future? A. Yes, sir. Q. And are you also familiar with the situation along the Sacramento river in the vicinity of the city of Redding with reference to bridge sites? A. Yes, sir. Q. And, Mr. Phillips, what have you to say as to the potential demands for bridge sites across the Sacramento river in this vicinity? A. Well, there has been a potential demand for one or more for the last ten years, to my knowledge. Q. That is, in this locality? A. Somewhere along in this vicinity. Q. Have those demands been limited to bridge sites for highways only, or for other purposes? A. Well, I couldn't say as to that; to my own personal knowledge I know that there has

been a potential bridge site in view for the last eight or ten years for highway purposes. Q. Now, in view of the prospective development to the north, and in view of what has taken place in the last few years with reference to that development, what have you to say as to whether or not there has been or is a potential demand for bridge sites for other purposes other than highway purposes in this locality? A. Probably is. Q. Well, is it your opinion that there is such a demand? A. Yes. Q. Now, Mr. Phillips, are you familiar with the property of the defendant John Diestelhorst, involved in this action? A. Yes, sir. . . . Q. Mr. Phillips, from your examination of the John Diestelhorst property involved in this action, to what purpose in your opinion is that property best adapted? A. Bridge site purposes. Q. Are you familiar with the market value of property generally in this locality? A. Yes, to a certain extent. Q. And I will ask you if you know the market value of the property of the defendants John Diestelhorst and wife, involved in this action as of October 9, 1933? A. Yes, sir. Q. What in your opinion is the market value of the property of the defendant, John Diestelhorst and wife, on or about the ninth day of October, 1933, in view of all the uses and purposes to which said land was adapted or could be reasonably adapted and in view of the existing wants of the community. A. I would say twenty thousand dollars.''

Upon cross-examination Mr. Phillips testified:

'' . . . Q. . . . I mean you do not know of any person or corporation that wants to build a bridge or is liable to want to build a bridge at that point, do you? A. I am not acquainted with them, no. . . . Q. Mr. Phillips, can you give any reason why anybody would want to build a bridge situated at the north end of Market street except the city of Redding or the State of California? A. I couldn't say there isn't anybody. . . . Q. Mr. Phillips, do you think there is any possibility that any railroad is going to build up Market street, the main business street in the city of Redding? A. I do not know why you should not let them build up there. . . . Q. Do you know any other, or have you known any other person or corporation during the last ten or twenty years for that matter that has been in the market for a potential buyer of bridge sites here in the city of Red-

ding? A. Other than said railway you mentioned? Q. Yes. A. I don't know, there may be others.

Various objections were made to the foregoing testimony and a motion to strike out all the testimony of the two witnesses relating to the value of the land sought to be condemned as a bridge site was made upon the grounds that it was speculative and was not founded upon any showing that the witnesses had any knowledge as to the value of the bridge sites and that they knew of no one excepting plaintiff and the state of California who were in the market for bridge sites. ■ This motion to strike was made after the last witness had left the stand, but at that time counsel for plaintiff announced he proposed to make the motion and suggested that it might save time if the motion were deferred until the close of defendant's case. To this, counsel for defendants demurred but made no formal objection thereto. The following morning the motion was made and again no objection was made to the motion that was made too late. However, regardless of the fact no formal objection was made, this was a matter within the discretion of the trial court and we can see no prejudice to defendant in the action taken. Undoubtedly if defendant had deemed it advisable he could have requested and obtained permission to reopen his case for the introduction of further testimony, covering, if he could, the matters stricken out on motion.

In ruling upon the motion to strike out, the court said: " . . . Under these circumstances, members of the jury, the court will grant the motion of Mr. Tillotson to strike from the record the statement of value for bridge site purposes as expressed by both Mr. Phillips and Mr. Dozier and you are instructed in deliberating on your verdict to eliminate that testimony and not consider it. . . . "

In addition to granting the motion to strike the evidence bearing upon the value of the property for bridge site purposes, the court in its instructions directed the jury to disregard all such evidence in their deliberations. The court also refused to give certain instructions offered by defendants dealing with the adaptation of the particular land for bridge site purposes as an element of market value. Upon the general principles of condemnation counsel are in ac-

cord, but appellants claim they should have been permitted to show adaptability and availability of the property condemned for a bridge site, and that it was error to strike out evidence tending to establish that fact. The ruling of the court discloses that appellants were permitted to show both adaptability and availability, and the only portion stricken out was the expressions of the witnesses as to the market value of the property for bridge site purposes.

We believe the inability of appellants to establish marketability of the property as a bridge site justified the action of the trial court. ■ The definition of market value so often quoted in the later cases on eminent domain defines it as "the highest price in terms of money that the land will bring if exposed for sale in the open market with a reasonable time allowed to find a purchaser buying with knowledge of all of the uses and purposes to which it is adapted and for which it is capable of being used." (*Sacramento R. R. Co.* v. *Heilbron*, 156 Cal. 408 [108 Pac. 979].)

■ While it is true from the mere fact that no one is immediately ready, willing and able to purchase a particular piece of property it does not follow that the property has no market value, still, as was said in *Joint Highway District No. 9* v. *Ocean Shore R. R. Co.*, 128 Cal. App. 743 [18 Pac. (2d) 413] : "A market is essential to a market value." In other words, a demand for the property is necessary, although that demand may be either active or potential. ■ In the present case the witnesses attempted to show a potential demand for bridge sites by the construction of Kennett dam or the construction of some proposed railroad, but those projects are vague and uncertain, at least as to their influence upon the bridge site of defendants, and they are remote, speculative and conjectural.

It is practically conceded by the two witnesses called by defendant that the demand for bridge sites is very limited and that available sites are numerous, and that outside of the state or municipality they knew of no prospective buyers for bridge sites in the vicinity of Redding. It seems, therefore, the witnesses were basing their estimate of market value of the land sought to be condemned in this action solely upon the ground that the City of Redding needed it to carry out the terms of its contract with the California

Highway Commission, and that there was no potential demand for bridge sites from any other source. Such testimony is inadmissible. (10 Cal. Jur. 339.) This situation is analogous to that presented in *Gilmer* v. *Lime Point*, 19 Cal. 47, where the owner attempted to prove the value of the premises as a site for a government fortification. Such evidence was held inadmissible because there was no market for the land for such purposes, competition being essential to a market and the government being of necessity without a competitor for the purchase of land for purposes of fortification. Also in the case of *Central Pacific R. R. Co.* v. *Pearson*, 35 Cal. 247, concerning the taking of river frontage by a railroad company for railroad purposes, the court said:

"The testimony in relation to the value of wharf privileges on the shore of the Sacramento river, where the tide ebbs and flows, given for the purpose of enhancing the value of some of the land sought to be appropriated, was also improperly received, for the obvious reason that the party claiming the compensation had no wharf franchise. The mere fact that the party might at some future time obtain from the State a grant of a wharf franchise if allowed to remain the owner of the land, is altogether too remote and speculative to be taken into consideration."

The case of *Joint Highway District No. 9* v. *Ocean Shore R. R. Co.*, *supra,* is very enlightening. There a highway district sought to condemn property owned by the Ocean Shore Railroad Company, which had spent a vast sum of money in constructing a roadbed over and across a strategic point of land between San Francisco and Santa Cruz. A motion to strike the testimony as to the value of the lands was made as in this case, but the motion there was properly denied because it appeared that there a potential demand was established for the property in question. It was shown the railroad company had kept its options in force and contemplated the construction of their railroad when certain litigation had been determined, and a toll road over the right of way was actually being considered in addition to the highway sought to be constructed by plaintiff in that action. In the instant case no demand, either actual or potential, was suggested by either of the witnesses called by defendants.

In the case of *City of Stockton* v. *Ellingwood,* 96 Cal. App. 708 [275 Pac. 228], the court discussed fully the different elements which might be considered in determining market value and assembled and analyzed many cases bearing on that point. That case had to deal with the value of lands as a reservoir site and it was in that case practically undisputed there was a demand for reservoir sites and that the number of undeveloped reservoir sites was becoming fewer. No such situation exists as to bridge sites.

Considerable emphasis is given by appellant to the case of *Little Rock Junction Ry.* v. *Woodruff,* 49 Ark. 381 [5 S. W. 792, 4 Am. St. Rep. 51]. In that case the railroad sought to condemn a point of rocks across the Arkansas River from Little Rock, for a bridge site. That point appears to be a strategic and unique point of rocks. Among other things the court said: ''Of course it does not follow that because a particular spot of ground constitutes a good bridge site that it therefore has great market value. There may be no reasonable probability that any one will ever want to build a bridge at that point. This probability is an essential condition of value in such cases. . . . The evidence is not entirely satisfactory to us but yet we think it fairly conduces to show that the principal thing which lent value to the point of rocks was its eligibility as a bridge site and that it had been somewhat coveted. If its principal value consisted in its advantages for bridge purposes it can hardly be claimed that the jury went beyond the estimates of the witnesses.''

The foregoing case differs from the case before us in that the particular point of rocks possessed peculiar and coveted advantages for a bridge, and as such was recognized as a key to be obtained by any company desiring to construct a means of transportation across the Mississippi River in that vicinity. There was not there, as in the case before us, many bridge sites, and there appeared to be keen competition for the obtaining of this point of rocks, a fact not found in the case at bar.

It seems apparent from the brief excerpts of the testimony we have quoted from witnesses Dozier and Phillips that their opinion as to the market value for bridge site purposes was properly stricken as being based upon speculative, remote

and conjectural possibilities. Assuming that the Central Valley water bridge may in time become a possibility, even then there is no assurance that such construction would create a demand for a bridge other than that for a state highway, which possibility is too remote and speculative, and justified the court in striking out the proffered testimony, giving the instructions it did, and refusing to give certain instructions offered by appellants.

The judgment is affirmed, appellants to recover costs.

Steel, J., *pro tem.*, and Thompson, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 5, 1936.