353 P.2d 185

STATE of Arizona ex rel. Robert MORRI-SON, Attorney General, Appellant,

v.

JAY SIX CATTLE COMPANY, Inc., a cor-poration, P. C. Getzwiller and Marian T. Getzwiller, his wife, Appellees.

No. 6720.

Supreme Court of Arizona.

June 8, 1960.

Rehearing Denied Aug. 15, 1960.

See also 85 Ariz. 220, 335 P.2d 799.

Robert Morrison, Former Atty. Gen., Wade Church, Present Atty. Gen., and Charles L. Hardy, Sp. Asst. Atty. Gen., for appellant.

Dunseath, Stubbs, Morse & Burch, and J. Elliott Dunseath and Robert C. Stubbs, Tucson, for appellees.

BERNSTEIN, Justice.

This is an appeal by the State of Arizona from a judgment based upon a jury verdict awarding Jay Six Cattle Company, Inc. (hereinafter called "Jay Six") the sum of $80,000, and P. C. Getzwiller and Marian T. Getzwiller (hereinafter called "Getzwiller") the sum of $15,000. The action was commenced by the State to condemn land belonging to Jay Six and Getzwiller.

As of the date of the condemnation in October, 1957, Jay Six owned two sections, described as sections 17 and 18, which fronted on the south side of the Tucson-Benson Highway for a length of two miles, and was also owner or lessee of other adjoining sections. Jay Six had access to the highway through approximately six gates located in sections 17 and 18 along the highway.

The Getzwiller land consisted of approximately 350 acres which fronted on the north

side of the highway for one-half mile and abutted, for approximately one mile, the east side of Mescal Road, which ran north-south and led onto the highway. Getzwiller had direct access both to the highway and to Mescal Road.

The purpose of the condemnation was to convert the Tucson-Benson Highway from a two-lane highway into a four-lane controlled-access highway. Access to the highway along the area in question was to be permitted only via a single interchange to be constructed at the intersection of the highway by Mescal Road and the section line between sections 17 and 18. Mescal Road was to be elevated to cross above the highway with lanes leading therefrom to provide entrances to and exits from the east and west lanes of the highway. Mescal Road was graded to permit entrances thereto at points north and south of the highway. A frontage road running east-west was to be constructed north of the highway and was to be graded to provide access to the elevated Mescal Road. No frontage road was planned for the south side of the highway along the Jay Six land.

To accomplish the reconstruction of the highway, the State condemned 36.76 acres of Jay Six land along the two mile length of the abutting highway and for a distance along the section line between sections 17 and 18. The condemned Getzwiller land consisted of 3.12 acres which abutted the highway and Mescal Road.

After the reconstruction Jay Six will have access to the Tucson-Benson Highway via the interchange which can be reached only by entering Mescal Road, more than 1,000 feet south of the highway. Getzwiller will have access to the highway at the north entrance of Mescal Road and at the east entrance of the frontage road. Jay Six and Getzwiller claimed compensation for the value of the land taken and severance damages to their remaining property caused by the reconstruction of the highway and the condemnation of their rights of access thereto.

On this appeal, the State has assigned thirteen errors, some of which may be discussed together, and all of which are considered below.

The State claims first that the court erred in permitting four witnesses to testify, over objection, to their opinion of the value of the condemned land on front footage and other speculative bases not supported by the facts. The State relies in the main on the fact that there was no proof of prior sales of the Jay Six or Getzwiller property or, indeed, of any similar property in the area on a front footage basis.

The four witnesses were Kathryn Getzwiller, who owned other property in the area and had been in the real estate business as a saleswoman for approximately four years; J. R. Blake, who had devoted his time exclusively to buying and selling land

in the area on his own account for approximately eight years; William Fraesdorf, a real estate broker and land appraiser, who had been engaged in the real estate business in the area for approximately eleven years; and Dan C. McKinney, who had acted as broker in the sale and purchase of ranches in the area and had managed and owned ranches in Arizona and Nevada. These witnesses testified that they were familiar with the property in the area, and the Jay Six and Getzwiller land, in particular; that the Jay Six land was being used and operated as a cattle ranch; that the Getzwiller land was being used for a private residence and, in a limited way, for cattle grazing; that the highest and best use of the Jay Six and Getzwiller land in October 1957 was for commercial and residential development and for investment purposes; and that based on the location, topography and accessibility of the property, the development and availability of other property in the area, and other factors which were testified to, the Jay Six and Getzwiller land which fronted on the highway, and which was condemned by the State, had a market value in October 1957 on a front footage basis.

 It is clear, and, indeed, it is not disputed that each of the four witnesses was qualified generally to testify to the value of the land in issue. See 18 Am. Jur., Eminent Domain, §§ 355, 356. As qualified experts, they could appraise the land on any reasonable basis, subject to limits properly imposed by the trial judge.

As stated in the Board of Regents etc. v. Cannon, 86 Ariz. 176, 178, 342 P.2d 207, 209:

"The question of whether any witness, whether or not designated 'expert' is competent to testify on a given subject rests in the sound discretion of the trial court, and its exercise will not be reviewed but for abuse."

 The fact that there were few prior relevant sales in the area and that these sales had been made on an acreage basis does not necessarily preclude expert testimony that the land in question had a market value on a front foot basis. Prior sales are only one element in determining market value as of a particular date and so long as the qualified witnesses testify to the factors within their special knowledge and competence upon which they base their opinion, even though they give little or no weight to the prior sales, their opinions of market value may, within the sound discretion of the trial court, be admitted.

In Board of Regents, etc. v. Cannon, supra, the expert witnesses appraised the market value of the land in question primarily on the basis of the rental income derived from the property. In affirming the trial court's admission of such testimony, this Court stated:

"It is true that there are other elements which may be used to determine market value, including a knowledge of the sales prices of other property similar in character and locality, but we know of no rule which requires the use of this element exclusively. If the witness testifying as to market value bases his opinion upon a recognized method of determining it which is of such a nature that it is not a matter of common knowledge, but results from special experience or training of the witness, his opinion in that matter may be regarded as expert. Upon cross-examination he may be questioned as to the extent of his knowledge of other elements, and lack of such knowledge would be a matter for the jury to consider in weighing the value of the testimony." (86 Ariz. at page 179, 342 P.2d at page 209)

■ Here, the essential point is that there was testimony from these witnesses and others that the use to which the Jay Six and Getzwiller land was being put in October 1957 was not its then highest and best use. Such evidence was clearly competent. As was stated in County of Maricopa v. Paysnoe, 83 Ariz. 236, 239, 319 P.2d 995, 997:

"A valuation which does not take into consideration the highest use would not be the fair market value and therefore would not be just compensation. * * * An owner who is making only a minor use of premises cannot be deprived of its value for a major use if that major use goes to a higher market value."

The testimony that the highest and best use of the Jay Six and Getzwiller lands was for commercial purposes and that the land had value on a front footage basis, was given not as a forecast of future events but in response to questions posed in terms of the fair market value of the land as of October 1957. The witnesses testified not only to the availability, adaptability and reasonable foreseeability of the land for commercial purposes but also to its "present demand"; that is, its demand as of the date of the condemnation.

Thus, Kathryn Getzwiller testified that she had refused $10 a front foot for her own property in the area, that a number of people had questioned her about buying property in the area for commercial and business purposes and that developers and builders had confirmed her opinion as to front footage value. Dan C. McKinney testified that he had tried to obtain for his customers property which fronted on the highway. William Fraesdorf testified to contacts he had with, and inquiries he received from, people, locally and outside the state, who wanted to buy land in the area, as well as to the terms on which they were willing to make a purchase. Another wit-

ness, Theodore E. Leonard, who a few months prior to the condemnation had commenced operating a gasoline service station about one and one-half miles from the main Jay Six entrance gate, testified that he had acquired his property for motel, restaurant and other commercial purposes, which had been frustrated by the State's condemnation actions. These and other witnesses testified that the demand for highway frontage property for commercial purposes implied front footage values.

The above testimony of the expert witnesses, which appears to be hearsay and not admissible to prove value, was not received for that purpose. Such testimony was introduced to qualify these expert witnesses and to establish their competence to base their opinions of value on their knowledge of and experience with the present demand for property in the area on a front footage basis. See Board of Regents etc. v. Cannon, supra. Indeed, the State itself inquired into many of these matters upon its voir dire examination of these witnesses.

The limited nature of the demand for the property, whether on an acreage or front footage basis, was explained by the witnesses as being the result of the predominantly State or Federal ownership of the property in the area and of the refusal of the few private owners to sell their land or offer it for sale. The point is, as noted above, that prior sales are not the sole test of market value and are, accordingly, not the sole test of present demand.

It follows that prior sales made on an acreage basis which reflected the use of property for cattle grazing purposes would not necessarily be determinative of the basis upon which the property, which fronted on a highway and had direct access thereto, would be valued for its best use as commercial and investment property. Testimony of values on an acreage basis may thus be subject to the same kind of attack as has been made on this appeal to the front-footage testimony.

After reviewing the record herein, we hold that the trial court did not abuse its discretion in permitting the witnesses to appraise the market value of the Jay Six and Getzwiller property on a front footage basis.

The State's second group of assignments is that the amount of damages testified to by the witness Fraesdorf and set forth in Exhibits 16A and 16B was improper for the reason that it twice included the value of the land taken. The State claims that the witness and the exhibits computed the difference between the value of *all* the Jay Six and Getzwiller land before the condemnation and the value of the *remaining* land after the condemnation, and *added* to the resulting figure the value

of the land taken. It is clear that such method of computation is improper because it duplicates, in effect, the value of the land taken.

A.R.S. § 12–1122 prescribes the proper measure as the value of the condemned land plus severance damages or difference in value of the *remaining* land. A review of the record makes it clear that the testimony and exhibits did not, as claimed, include the value of the condemned land twice.

The witness Fraesdorf did testify to the value of all the land before the condemnation and the value of the remaining land after the condemnation, and computed the difference, plus the cost of necessary restorative improvements, as total damages. The witness then testified separately to the value of the land taken, but this figure was not added to the total damages. Rather it was subtracted therefrom to arrive at separate figures for the value of the condemned land and for the severance damages to the remaining land. Such method of computation was not improper and was indeed utilized by the State's expert witness. Further, exhibits reflecting the values testified to by Fraesdorf were received in evidence either without objection or where objection was made, it was subsequently withdrawn.

Exhibits 16A and 16B were based on the testimony of witness Sanders K. Solot, a professional appraiser and licensed real estate salesman, who computed damages on a different basis from that adopted by witness Fraesdorf. Solot testified to the value of all of the land (including the condemned land) both before and after the taking. To the difference between these values, Solot added the value of the land taken and the cost of the necessary improvements. These computations were reflected in Exhibits 16A and 16B for the Jay Six property and in Exhibit 17 for the Getzwiller property. Objection was made by the State to Exhibits 16A and 16B, but not to Exhibit 17.

It is clear that the figure representing the difference between the value of *all* the land before and after the taking does not take into account the total loss of the condemned land; it takes into account only the decline in value of the condemned land as if that land had not been taken. To remedy this omission, however, Solot added to the computed damages the *full value* of the condemned land *before* the taking. This is erroneous because part of this value is already reflected in the damages; all that should be added is the value of the condemned land *after* the taking.

The State recognized this discrepancy and upon cross-examination obtained from Solot the concession that his estimate of the total damages to the Jay Six property, as reflected in Exhibits 16A and 16B, was overstated by the sum of $1,600. It was also stipulated that the damages to the Getzwiller property, which were reflected

in Exhibit 17 (which had been received in evidence without objection and was not assigned as error on this appeal), were similarly overstated by the sum of $100. Thus, the mistake in Exhibits 16A and 16B, to which the State now assigns error, was corrected in the presence of the jury, and cannot be said to have been prejudicial to the State.

Further, the instructions of the trial judge on the applicable measure of damages permitted the jury to take the value of the condemned land into account only once. Thus, the court stated that

"* * * the only issue before you * * * is how much money should be paid to the Defendants as compensation for the land actually taken from them and how much money, if any, should be paid to the Defendants for damages to their *remaining* land by reason of the said taking."

"The measure of just compensation which must be paid to the Defendants for the value of the portion of their land taken and for the damage, if any, to the *remaining* portion is fair market value * * *."

"Now, the measure of damages to the Defendants' land is the difference between the fair market value of the land immediately prior to the taking and a value of the remaining land im-

mediately after the taking." (Emphasis added.)

Although the court instructed the jury to determine the damages in a single sum, each for the Jay Six and Getzwiller property, rather than, as indicated by A.R.S. § 12–1122, subd. B, separately for the value of the land taken and the severance damages, no objection thereto was made by any party or assigned as error herein by the State.

In view of all the circumstances, we hold that the introduction of the above testimony and exhibits did not constitute reversible error.

█ The State further assigns as error the refusal of the trial court to permit it to cross-examine witness Fraesdorf on the basis of an appraisal of the Jay Six property prepared by him, as of December 30, 1957, for Federal tax purposes. The court ruled that the appraisal report was not material, noting that it specifically provided that the figures contained therein "are based on value as a cattle ranch only."

It is clear that such appraisal is inadmissible as a hearsay document insofar as it is offered as independent evidence of the value of the Jay Six property. It is admissible, however, to impeach or otherwise discredit the testimony of the witness Fraesdorf. Fraesdorf testified that the highest and best use of the Jay Six property was for investment purposes, for which

purposes he based his opinion of the value of the property. The appraisal was based not on this same use or, indeed, on any use which Fraesdorf considered as the best for the property; it was based on a cattle ranch use, in accordance with specific instructions given to him and evidenced in the appraisal report.

Thus, the trial court, after reading the appraisal report, concluded that it had little or no probative weight for the purpose of impeaching Fraesdorf's testimony of the value of the property for its best use, and excluded it as irrelevant.

We believe the State should have been permitted the opportunity to examine the report and to cross-examine Fraesdorf on the basis of its contents, and that the ruling of the trial court, accordingly, constituted error. We conclude that such error was merely technical and harmless, however, for the reasons that such evidence, even for purposes of impeachment, was of slight probative force, that the examination and cross-examination of the witness Fraesdorf was otherwise very extensive, and that, in view of the voluminous evidence in the record, the ruling of the trial court did not "affect the substantial rights" of the State. Rule 61, Rules of Civil Procedure, 16 A.R.S. See also, Woodmen of the World Life Ins. Soc. v. Velasquez, 60 Ariz. 457, 462, 139 P.2d 766; Johnson v. Nickels, 66 N.M. 181, 344 P.2d 697, 699; Donahue v. Kenney, 330 Mass. 9, 110 N.E.2d 846, 849;

cf., Arizona Constitution, Article 6, Section 22, A.R.S.

In 5 Nichols, Eminent Domain, § 18.1[2] (3d ed.), it is well stated that

"it is undoubtedly the fact that in passing upon the admissibility of evidence of value more is left to the discretion of the trial court than in the determination of most other issues. It follows that an exception to the admission or exclusion of evidence in a land damage case will ordinarily not be sustained except in case of manifest error."

We hold that the exclusion of the appraisal did not constitute reversible error.

The State next assigns as error that the court erred in denying its motion for a new trial on the ground that the damages awarded in the verdict and judgment were improperly based upon front footage values and upon severance damages to separate and distinct parcels of land not affected by the taking. Our discussion, above, of the admissibility of the testimony relating to front footage values makes it clear that a verdict or judgment based upon such values is not improper.

The position of the State, in essence, is that severance damages may be awarded, under A.R.S. § 12–1122, only for land which has the same use as the land which is taken. Subdivision A of that section

provides, in relevant part, that the court or jury shall ascertain and assess:

"If the property sought to be condemned constitutes only a part of a larger parcel, the damages which will accrue to the portion not sought to be condemned by reason of its severance from the portion sought to be condemned, and the construction of the improvement in the manner proposed by the plaintiff."

The State contends that because the highest and best use of the condemned land, allegedly as commercial property, was different from that of the remaining land, allegedly as residential property, severance damages may not be awarded for the remaining land. The State urges that Jay Six and Getzwiller would have been entitled to severance damages for their remaining land only if they had conceded that all their property be valued for cattle grazing purposes, which would, in effect, have denied front footage value to any of their property.

The distinction drawn by the State is unrealistic. All of the land owned by Jay Six or Getzwiller was contiguous and thus can properly be considered as a "larger parcel," only part of which is sought to be condemned, within the meaning of A.R.S. § 12–1122. The fact that the remaining land was not valuable for commercial purposes does not mean that it has not lost value, as a direct result of the condemnation, for residential purposes.

There was considerable testimony at the trial to demonstrate that the value of the remaining land was dependent upon the availability of commercial land having access to the highway; that is, that the remaining land was valuable for residential development because the property between it and the highway was usable for commercial purposes and because both parts of the land had free access to the highway. Indeed, the evidence showed that substantial severance damages resulted from the taking of the commercial land and from the partial deprivation of access to the highway.

 Thus, it is not the identity of uses of the condemned and remaining land which is significant, but the dependency of the value of the remaining land upon its use together with the use of the condemned land. This point is well stated in United States v. 1532.63 Acres of Land, D.C., 86 F.Supp. 467, 476:

"The unitary value of the property of the condemnee as a whole is a material matter for consideration and it is well settled that just compensation must be paid not only for the property actually taken but also for the destruction of the unitary value of other property not presently taken, which may have a *special value because of its uni-*

*fication with the property taken."* (Emphasis added.)

In the instant case, the witnesses testified to the "special value because of its unification with the property taken," of the remaining land, not only in the sections which were partially condemned but also in the other adjoining sections. This testimony was subjected to very thorough cross-examination by the State on the value and use of each section of remaining land and, particularly, on the interrelationship of that land and the condemned land.

In these circumstances it was clearly proper for the trial court not to rule as a matter of law that Jay Six and Getzwiller were not entitled to severance damages for the remaining land, but to permit that issue to be determined by the jury in computing the damages.

As stated in 4 Nichols, supra, § 14.31:

"In many cases the court can, as a matter of law, determine that lots are distinct or otherwise, but ordinarily it is a practical question to be decided by the jury or other similar tribunal which passes upon matters of fact, which should consider evidence on the use and appearance of the land, its legal divisions and the intent of its owner and conclude whether on the whole the lots are separate or not."

The question of the extent of the severance damages having been properly sub-mitted to the jury, whether a new trial should have been granted on the determination of that question by the jury rested within the sound discretion of the trial court.

County of Maricopa v. Paysnoe, supra, presents an analogous situation. There, Maricopa County condemned the north 7 feet of two contiguous lots. One lot, Lot 24, was used for restaurant purposes; the other, Lot 23, was vacant but was used at times for overflow parking for the restaurant. The County contended that as both lots were devoted to the same use, they must be considered as one parcel in computing the severance damages. In rejecting that contention Chief Justice Struckmeyer, speaking for the Court, aptly stated:

"Assuming without deciding that these lots were at the time of taking devoted to the same use, we are still not convinced that they are to be arbitrarily treated as a single unit in determining appellees' severance damages.

\* \* \* \* \* \*

"We hold that the appellant's valuation of the two lots as one parcel was not the proper measure of appellees' damage because in this case it did not give consideration to the market value of Lot 23 for commercial purposes independent of Lot 24. The trial court, therefore, did not err in considering that each lot had severance damages independent of the other and in determin-

ing that appellees were damaged in some amount by reason thereof. If a bona fide dispute did exist arising out of facts in evidence which created an issue as to the most valuable use to which the land might be applied, then there would be a proper question for the determination of the court or jury." (83 Ariz. at pages 238, 239, 319 P.2d at pages 996, 997)

For a situation where a condemnation affected land which had several uses, all of which were taken into account in computing severance damages, see Pima County v. De Concini, 79 Ariz. 154, 285 P.2d 609.

We hold that the trial court did not commit error in refusing to set the verdict aside on the grounds asserted on this appeal by the State.

The State next claims that the trial court, in instructing the jury, erred in refusing to give Instruction No. 3–C in the form requested by the State [1] and in refusing Instruction No. 3–D.[2]

Instruction No. 3–C, in sum, would have directed the jury to consider not only the past and present uses of the land, but also any use which may be reasonably probable in the immediate future, with no consideration to be given to remote, speculative or unproved exceptional uses. Instruction No. 3–D would have instructed the jury not to consider the use of the land for business or home sites if such use depends upon vague or uncertain conditions or is merely speculative.

Jay Six and Getzwiller do not dispute the correctness of these proposed instructions. On the contrary, they urge that the substance of such instructions was more than adequately covered in the following instruction given by the trial court:

"I have got one other instruction here about highest and best use. The

---

1. Plaintiff's Instruction No. 3–C
 In determining the value of the land, you may take into consideration not only the present and past uses or capabilities of the land, if shown by the evidence, but also any use to which the land may reasonably be put in the immediate future, if such appears from the evidence, but this does not mean that you should consider any uses that are remote, or imaginary, or vague or speculative, even though such may have been mentioned or testified to by witnesses; nor must you consider any value that might be suggested for the land in exceptional or unusual instances or under peculiar circumstances, not shown to exist and which do not tend to show the fair market value

of the land; but as to any future uses you must be careful to consider only such as are reasonably probable.

2. Plaintiff's Instruction No. 3–D
 You are instructed that though you may believe from the evidence that on October 8, 1957 the highest and best use of the properties in question sought to be condemned might possibly at some remote future date be for subdivision for home sites or business sites, still if you further believe from the evidence that such use depends upon vague or uncertain conditions or contingencies, or that such proposed use is merely speculative, then you have no right to consider at all any evidence of its adaptability for such use.

definition of those words is the use, by highest and best use is meant the most profitable likely use to which a property can be put. The opinion of such use may be based on the highest and most profitable use to which the property is adapted and needed or likely to be in demand in the reasonably foreseeable future. Elements affecting value, however, which depend upon the events or come by facts of occurrences which fall within the realm of possibility are not fairly shown to be reasonably probable and should be excluded."

The court further instructed the jury:

"In order for land to be valued for purposes other than that to which it is being put at the time of the taking it must first be shown, (1) that the property is adaptable to some other use, (2) that the other use is reasonably probable within the reasonably foreseeable future or within a reasonable time and, (3) that the market value of land has been enhanced thereby."

Based on a reading of the entire instructions, and especially the paragraphs quoted above, we conclude that the trial court properly and adequately instructed the jury on the matter encompassed in the State's proposed Instructions No. 3–C and 3–D. As stated in Evans v. Mason, 82 Ariz. 40, 48, 308 P.2d 245, 250, 65 A.L.R.2d 936:

"It will not be deemed error to refuse an instruction requested by a party where, in viewing the instructions as a whole, the jury, was properly informed as to the law governing the case. Ruth v. Rhodes, 66 Ariz. 129, 185 P.2d 304; Southwestern Freight Lines v. Floyd, 58 Ariz. 249, 119 P.2d 120."

See also, e. g.: Hirsh v. Manley, 81 Ariz. 94, 300 P.2d 588; Allied Van Lines v. Parsons, 80 Ariz. 88, 293 P.2d 430; Southern Pacific Railroad Co. v. Mitchell, 80 Ariz. 50, 292 P.2d 827.

We hold that the trial court did not err in refusing the State's above instructions.

 By its last assignment the State claims that the trial court erred in awarding Jay Six and Getzwiller, as taxable costs, the fees of their expert witnesses and the cost of the exhibits received in evidence at the trial. In State v. McDonald, 87 Ariz. ——, 352 P.2d 343, this Court held that expert witness fees are not taxable as costs in an eminent domain proceeding. We hold that the same rule is also applicable to the cost of exhibits. See A.R.S. §§ 12–332, 12–1128; Rule 54(f), Rules of Civil Procedure.

The Memorandum of Costs and Disbursements is hereby modified by deleting therefrom the items relating to expert witnesses' fees, in the total sum of $1,610, and exhibits, in the sum of $449.27, and as so modified is affirmed.

The judgment is affirmed.

STRUCKMEYER, C. J., and JOHNSON, J., concur.

PHELPS, Justice (dissenting).

The following dissent was written by Justice LEVI S. UDALL, upon slight collaboration with me. His untimely death prevented his signature hereto. I concur with it and adopt it in its entirety.

I am unable to agree with the majority in affirming the judgment of the lower court, as it is my firm opinion that a bad precedent is being established as to the admissibility of evidence in fixing damages. Admittedly it is a difficult task to adjust the rigid rules of law to the requirements of justice and indemnity in condemnation cases such as this. It is my view, however, that the courts must be realistic and not visionary in the judicial ascertainment of truth. For the reasons hereafter stated, I would unhesitatingly reverse the judgment with directions to grant a new trial.

To make my position clear it is necessary to better orient oneself with the existing facts in the area with which we are here concerned. The subject properties lie on the plateau just east of the Cochise-Pima County line on the Tucson-Benson Highway (U.S. 80). The small town of Benson (population 2,500) is some 7 or 8 miles to the East, and the large city of Tucson is approximately 40 miles to the West; and there are no "built up areas" in between.

These two defendants (Getzwiller and Jay Six) own a total of 6,360 acres in fee in their separate parcels; and Jay Six controls an additional 3,000 acres on State leases. The total area taken from the two defendants in this highway condemnation action is 39.88 acres, comprising a narrow strip along the entire highway frontage of both defendants. As the majority has noted, there will be some impairment of access to the remaining land. The total award was $95,000.

Under the decision reached by the majority, defendants—the owners of these vast tracts of virtually unimproved ranch lands in an area where the highest *existing* use is an occasional service station, truck stop, or roadside tavern—are being allowed damages for the taking of some two and one-half miles of highway frontage on the basis of a front foot valuation for "investment" purposes (i.e., for ultimate commercial use). Also, damages for lands far removed from the highway have been granted on the theory that such lands have a realizable value as residential homesites, this in spite of the fact that the only current occupants of the countryside are range cattle and a few ranchers and ranch hands.

How, we may ask, is such a result arrived at? The answer is simple: several witnesses for the defendants were permitted, over the State's vigorous objection, to declare their estimates of the selling price of the lands based on value for business and residential purposes. In reaching for the fair market value of the condemned property—properly based on the highest and

best use for which it could be sold on the date of the commencement of the condemnation action—defendants' witnesses *were allowed to assume a present market* for commercial and residential land in the area. If the assumption adopted by these witnesses is accepted, then exorbitant verdicts are inevitable. Neither the trial court nor the majority of this court questioned the assumption; the feeling seems to have been that if these experts said it was so, it must be so. From there, it was an easy and obvious step to admit evidence of value on a front foot basis as if there were a present market for this land on such terms.

In dissenting from this approach, it is my contention that the rules of admissibility of such evidence should be more strictly applied, for the protection of the condemner. All agree that a condemnee is entitled to receive compensation based upon the fair market value of his land for its then highest and best use. There is also unanimous endorsement of the proposition that the condemnation award may not be based on remote or speculative values. My point of difference with the majority is as to the means by which these two somewhat conflicting concepts may be distinguished, or, more specifically, as to how the jury may be given evidence of the highest and best use and still be kept insulated from speculative considerations. This is why the courts are required to warn the jury of "speculative values"—to prevent it from taking witnesses' predictions as if they were realities. In the instant case witnesses testified as to value for "investment" purposes. Considering the facts of this case, I take it that "investment", in this context, is simply a euphemism for "speculation."

At the trial below, witnesses for defendants were allowed to testify that the highest and best use of this two and one-half miles of highway frontage was for commercial "investment" purposes, *and that for such purposes its market value was some $10 per front foot* (estimates ranged from $5 per front foot for the less desirable frontage to $15 per front foot). Counsel for the State objected to the admission of such testimony and later moved that it be stricken. I believe that the trial court erred in denying such motions.

It should be noted that there were no sales anywhere in the area on a front foot basis, nor was there shown to be such a demand. All recorded sales were on an acreage basis. It is my understanding of the law that before evidence of "front foot" values could be admitted it would be necessary to first show that there was a *market or present demand* for such sites, or to show circumstances from which present market or demand could be reasonably inferred. In my opinion these requirements were not even remotely met; hence the expert witnesses called by the defendants to give their opinions as to values on a front foot basis were resting it upon nothing but spec-

ulation and conjecture. The objection to this testimony should have been sustained; its admission certainly "tainted" the verdicts.

It is undoubtedly the law that a condemnee may introduce evidence to prove that his property is then available for a higher use than that to which he has devoted it—if the probability of such higher use has actually affected the fair market value of the condemned land. However, as a condition precedent to the admission of evidence of the value of the property for such higher use, the condemnee should be required to lay a foundation which will establish the competency of such evidence. This foundation is essential in order to exclude witnesses' abstract notions of value and to limit the testimony to acutal *market* value.

The tenor of the testimony of these witnesses for the defense was that the highest and best use of the condemned property was for commercial purposes. I submit that this position is patently incredible. No witness testified that—at the time of the condemnation—anyone contemplated the actual erection of a commercial structure along that or other proximate areas of the highway. No witness suggested that, if the highway program had not intervened, an owner of frontage land in that area could —at that time or in the foreseeable future— have operated a remunerative business thereon. There is not the slightest showing that portions of this land far removed from the highway had a high use value for residential purposes then or ever. It seems clear that, whoever owned the land, it would remain unimproved for the foreseeable future, until such time as it became ripe for commercial exploitation. It is certainly unrealistic to award damages to defendant based on a two and one-half mile frontage when none of the evidence even suggests a use for commercial purposes except for occasional service stations located at intervals of several miles. This is speculation, pure and simple, and is no proper basis for a condemnation award. Having wholly failed to establish a current "highest and best use" of the land other than for ranching purposes, defendant should not have been allowed to introduce value testimony for other uses.

I Orgel on Valuation under Eminent Domain, 2d edition, § 31, "Speculative and Potential Uses and Values", gives an excellent dissertation on the problem. I quote two excerpts therefrom, viz.:

"The courts have been at considerable pains to exclude from consideration those mere possibilities which they regard as so remote and unlikely that they could hardly enhance the price at which the property could have been sold down to the date of the trial.

\* \* \*"

\*　　\*　　\*　　\*　　\*　　\*

"The courts draw the line at the point where it can be said that a purchaser would actually buy the property for the use in question. An appraiser must be prepared to show that the uses which he considered could actually command a price in the market. * * *"

A reading of the following cases indicates the requisites of the foundation which should be laid, prior to admission of evidence of value for a higher use. Olson v. United States, 292 U.S. 246, 54 S.Ct. 704, 78 L.Ed. 1236; Hall v. Delaware, L. & W. R. Co., 262 Pa. 292, 105 A. 98; Whitcomb v. City of Philadelphia, 264 Pa. 277, 107 A. 765; A. D. Graham & Co. v. Pennsylvania Turnpike Comm., 347 Pa. 622, 33 A.2d 22; State v. Thompson, Tex.Civ.App., 290 S.W. 2d 319; Arkansas State Highway Comm. v. Watkins, Ark., 313 S.W.2d 86; People v. Marblehead Land Co., 82 Cal.App. 289, 255 P. 553; City of Redding v. Diestelhorst, 15 Cal.App.2d 184, 59 P.2d 177; People v. La Macchia, 41 Cal.2d 738, 264 P.2d 15; Pruner v. State Highway Comm., 173 Va. 307, 4 S.E.2d 393; Sacramento Southern R. Co. v. Heilbron, 156 Cal. 408, 104 P. 979. The foundation should consist of a prima facie showing of:

(a) availability of the property for the higher use;

(b) adaptability to such use;

(c) reasonable foreseeability of such development;

(d) a present demand for property devoted to such use in the area of the condemned property.

Measured by this yardstick, the evidence objected to in the instant case is fatally defective in that a showing of the fourth element—*a present demand*—is lacking.

The requirement of proof of demand is in accord with common sense and with the accepted practices of expert appraisers. We may, perhaps, take judicial notice of the fact that Arizona today is undergoing a significant expansion in population, commerce, and industry, as a result of which land speculation is rife. Under these circumstances, almost any land development or appreciation in value may seem "reasonably foreseeable" to some people. However, until an actual demand for the higher use of property appears—until the land becomes ripe for such development—the appreciation can only be speculative; and condemnation awards must not be based upon speculation.

The expert witness Klafter, who appeared on behalf of the State, gave the following explanation for his refusal to take front foot valuation into account and for insisting that the lands in question be appraised as ranch property:

"Well, I have been taught in my appraisal and real estate experience, I

have learned that property sells on an acreage basis when other property in the area sells on an acreage basis, and when an appraiser finds that other property sells on an acreage basis, he values the property he is appraising on an acreage basis. Appraisers don't make value. Appraisers merely reflect what they find in the market place after searching the record to find out what other people have paid for property, supposedly informed buyers and sellers, and when property is— other property sells on a plot basis, like sometimes residential lots sell on a so much per lot or plot, appraisers value similar land on a plot or lot basis, and when an appraiser goes into the market place and he finds that other informed buyers and sellers are buying property on a per front foot basis, then he values property that he is appraising, if it is similar property selling on a front foot basis, then he values the property on a front foot basis in that area."

I believe that such an approach must be followed if the integrity of judicial valuation procedures in condemnation cases is to be preserved. Testimony offered without a foundation showing of actual demand for the higher use should not be admitted.

The majority perfunctorily acknowledge that admission of value evidence of this

nature requires a showing of demand. However, they fail to recognize the significance of the requirement, and the majority opinion sanctions the admission of such evidence with a wholly inadequate foundation. The purpose of the requirement is to exclude evidence of value which is purely conjectural, to limit the jury's considerations to present realities. By their failure to exact compliance with this rule, the court below and the majority of this Court have allowed the jury to be sadly misled in their quest for "fair market value." The majority suggest that a present demand for commercial highway frontage was established as a matter of fact by means of statements made by the witnesses in the course of their testimony. Such statements were incompetent for any purpose; they included: repetition of unsubstantiated and unaccepted offers to buy at $10 per front foot (specifically condemned in our unanimous decision in State v. McDonald, 87 Ariz. ——, 352 P.2d 343; reference to inquiries having been made as to the availability of such land in the area (hearsay, and of no probative value whatever); allusions to tentative attempts to purchase land in the area (hearsay, and completely irrelevant since it does not appear that prospective buyers contemplated purchase on anything other than an acreage basis); and reference to out-of-court statements of builders and developers as to what

might eventually have been done with the land had it not been for the condemnation (hearsay, and entirely conjectural). The majority take the position that, although direct evidence on each of these points is clearly inadmissible, still, they say, an expert may testify as to value with these assumptions as the sole basis for his conclusion of present demand. The logic of such an approach escapes me.

It has been held that an expert may not express his opinion unless he has facts to support his position. Board of Regents etc. v. Cannon, 86 Ariz. 176, 342 P.2d 207. It goes without saying that such facts must be capable of competent proof. An opinion of an "expert" which is supported *only* by rumor, hearsay, and other matters not admissible in a court of law should not be presented to the jury. The expert is accorded a favored position in the eyes of the law. He, and he only, is allowed to express his opinion on certain matters within the area of his expert knowledge. The rationale of this axiom is that the expert—due to his training and experience—is peculiarly well qualified to weigh the particular facts and to synthesize the knowledge of his field. However, where, as here, the "expert" opinion has no relation to provable facts, the justification for the admission of such testimony falls.

It is clear from the record that the jury must have based its award of damages to some extent upon the speculative evidence before it. Only two witnesses refused to indulge in the objectionable front foot valuations. The opinions of both these witnesses—one for the State (Klafter), and one for defendants (Solot)—assessed the damages at sums less than that which the jury returned in its verdict. Obviously, then, that verdict is tainted, and the judgment entered thereon should be reversed.

Aside from the admission of this incompetent evidence of value, another error committed by the trial court, in my opinion, also necessitates reversal and a new trial. The majority admit it was error—although they say it was not reversible—for the trial court to refuse to permit the State to cross-examine the defendants' principal witness Fraesdorf on the appraisal made by him of the Jay Six property less than five months prior to the trial. To my mind this constituted reversible error, as it was the State's one possible chance to nullify the damaging evidence of this key witness. In this respect, the majority opinion states:

"* * * We conclude that such error was merely technical and harmless, however, for the reasons that such evidence, even for purposes of impeachment, was of slight probative force, * * *" (353 P.2d at page 191.)

I cannot agree with this statement. *I fail to see how the majority presumes to weigh the*

*probative force of a document, clearly relevant on its face, the contents of which have never been made a matter of record.* The relevancy of this appraisal report appears from the following facts: The purpose of this phase of the proceedings was to determine fair market value. It is conceded that the disputed appraisal report—prepared for federal estate and income tax purposes—purports to declare the fair market value of the Jay Six ranch *for ranch purposes.* The witness Fraesdorf had testified that the value of the Jay Six ranch before the taking was $426,484.50, for investment purposes, and that its fair market value after the taking—*for ranch purposes*—was $296,900.80. The State's chief witness testified to the value before ($400,000) and after ($394,750) the taking—*for ranch purposes.* Thus it is readily apparent that the conflict between these experts revolved around one major point—*the value of the Jay Six spread for ranch purposes.* If any significant differential appeared between the value reported by Fraesdorf in his written appraisal and that to which he testified on the witness stand, his credibility would have been completely undermined. To deny the State this vital opportunity to destroy defendants' case was certainly more than "technical and harmless" error. This alone is sufficient grounds for reversal. A new trial should be granted.