ARKANSAS STATE HIGHWAY COMMISSION v. GEORGE POTEETE

4633                                    432 S.W. 2d 774

Opinion Delivered October 21, 1968

*Thomas B. Keys* and *James K. Biddle* for appellant.

*Gordon, Gordon & Eddy* for appellees.

LYLE BROWN, Justice.    This is an eminent domain proceeding instituted by the Arkansas State Highway Commission in connection with the construction of Interstate 40 through the town of Plumerville, Conway County.    The taking traversed a substantial portion of a subdivision owned by appellees, George Poteete and wife.    The Highway Commission's principal point on appeal concerns the fact that the jury was permitted to consider possible damages to twenty-eight lots, no part of which was in the actual taking.

Sixty full lots and portions of thirty-three lots were within the new right-of-way.    The Commission contended that those 93 lots were the only lots to be considered in awarding compensation.    It was the landowners' theory that 28 lots outside the actual taking were diminished in value because they were so interdependent with the parcels taken.    The trial court submitted to the jury the described controversy in this manner:    If the jury found that *each* of the 121 individual lots (60 taken, 33 partially taken, and 28 not touched by taking) constituted a *single unit of value,* then the Poteetes could not recover for any depreciation in value of the 28 lots; on the other hand, if the jury found there was a *connected or unity of use* of the 121 lots, then the entire 121 lots should be taken as a unit of value and used in calculating compensation.

The Commission relies principally on *Arkansas State Highway Comm'n. v. Taylor,* 238 Ark. 278, 381 S.W. 2d 438 (1964).    That case involved lots in a subdivision.    We held that where the only use shown for the lots was a separate and distinct use and the holding of each lot by itself, each individual lot constituted a unit of value.    In that event those lots not in the actual taking could not be considered in calculating compensation.

The fact situation in *Taylor* hardly makes it applicable to the case at bar.    There it was emphasized that

no testimony showed that any one of the lots in the subdivision was used, or would be used, in connection with any other lots. We hasten to reaffirm the law in *Taylor*, but it does not encompass every situation in which there is a partial taking of a subdivision. Long before *Taylor*, our Court made this pronouncement in *Kansas City So. Ry. Co. v. Boles*, 88 Ark. 533, 115 S.W. 375 (1908):

"This court has frequently held that in a proceeding by a railroad company to condemn a right of way the assessment of damages is not restricted to the injury done to the legal subdivision of land described in the petition, and that if the tract described is part of a larger connected body of land the owner may recover for the injury done to the tract as a whole. It follows from this that where the whole of a tract of land is taken it should be valued as a whole, and not according to the legal subdivisions as distinct and separate parcels of land.

" 'Whether a particular lot of land constitutes an independent parcel is a question which cannot be determined in the affirmative by the mere fact that it is separated from other land by a highway or street, or by paper lines, or by fences; nor can it be determined in the negative by the mere fact that it is all in one ownership and is not divided by streets or by paper lines.' *Wellington v. Boston & Main Rd.*, 164 Mass. 380; . . . "

In general terms it may be said that the controlling principle is "separate and independent" utilization as opposed to a "connected or unity of use." That is the essence of the test in *Boles*. See Nichols Em. Dom. Supp. V. 4, § 14.31; *USA v. 26.81 Acres*, 244 F. Supp. 831; *State v. Jay Six Cattle Co.* (Ariz.), 353 P. 2d 185; *U.S. v. Powelson*, 118 F. 2d 79.

An examination of the lots, including the utilities, reveals these elements of interdependence or evidence of the same:

1. A substantial number of the "untouched" lots on the north of the interstate are dependent, for sewage purposes, on Wall Street, which was taken, that being the natural outfall of a sewer line;

2. Access to the "untouched" lots on the north:

(a) Lots 1-12 in the northwest corner have no access except through lots that were in the taking (saving two lots bordering on Highway 92);

(b) Lots 2-6, Block 2, and Lots 13, 14, Block 3, are dependent for access on streets and lots in the taking;

(c) Lots 1, 2, and 3, Block 1 could not be reached except by traversing several adjoining lots (excepting Lot 1 which is bordered by a street on the east side);

3. "Untouched" lots in the southwest corner:

(a) Lot 25, which was partially taken, abutted Highway 92. Lot 26 abuts Lot 25 on the east. Testimony was to the effect that Lots 25 and 26 needed to be joined in a single sale to make an attractive unit with highway frontage;

(b) The highest economic value of Lots 26-30 was said to be dependent on the top tier of five lots adjacent on the north, which tier was partially taken;

(c) A partial taking of Lot 40, which abuts Highway 92, allegedly destroyed the marketability of Lot 39; those two lots would have been combined to make an ideal building unit with highway frontage;

(d) The taking closed the west end of a ten-foot alley running behind Lots 26-30. Appraiser Barnes tes-

tified that none of those lots could ever be serviced by the dead-end alley;

4. Appraiser Barnes pictured the highway right-of-way as running the full length, east and west, of the subdivision and roughly cutting a wide swath through the center. He reasoned that the street pattern serving most of the "untouched" lots had been destroyed. (A majority of the streets in the affected area now "dead-end" into the new highway.) He also asserted that the right-of-way would have to be utilized to run sewer lines to the "untouched" lots on the north. That was the route laid out by the town of Plumerville. Presently, according to Barnes, the cost of laying those facilities would be prohibitive;

5. There was also evidence that a number of the lots would necessarily be sold in groups of "three-lot-deep tiers"; and others would be sold in two-lot units. Witness Pearce testified that a normal homesite in Plumerville required two or more lots of the general size of those in the subdivision.

*Nichols* summarizes the rule in this manner, which we consider applicable here:

> "In many cases the court can, as a matter of law, determine that lots are distinct or otherwise, but ordinarily it is a practical question to be decided by the jury or other similar tribunal which passes upon matters of fact, which should consider evidence on the use and appearance of the land, its legal divisions and the intent of its owner and conclude whether on the whole the lots are separate or not." Nichols Em. Dom. Supp., V. 4, § 14.31.

We hold that the trial court acted properly in submitting the matter to the jury and we have summarized evidence which we think made the question one for the jury to resolve.

One other contention is urged for reversal. The Commission contends that testimony regarding compensation for the twenty-eight lots, no part of which was taken, would be in the nature of an assertion for special damages; that special damages were not pleaded and therefore no recovery is allowable. The answer is that the landowners here tried their case on the theory that the 121 lots had a unit of use and that the taking of a part of the unit diminished the value of the residual, or the twenty-eight lots. Diminution in value of part of an individual tract—if it is a unit—is not classified as special damages. *Arkansas State Highway Comm'n. v. Lewis,* 243 Ark. 943, 422 S.W. 2d 866 (1968).

Affirmed.

Byrd, J., dissents.