100 P.3d 932 (2004)
209 Ariz. 321
STATE of Arizona ex rel. Victor MENDEZ, Director, Department of Transportation, Plaintiff-Appellee, Cross-Appellant,
v.
AMERICAN SUPPORT FOUNDATION, INC., an Arizona non-profit corporation; RCH Investment Company, L.L.C., an Arizona limited liability company; Selwyn Jacobson and Janke Jacobson, husband and wife, Defendants-Appellants, Cross-Appellees.
Nos. 1 CA-CV 03-0196, 1 CA-CV 03-0434.
Court of Appeals of Arizona, Division 1, Department B.
November 26, 2004.
Terry Goddard, Attorney General By William S. Jameson, Jr., Assistant Attorney General, Jeffrey T. Murray, Assistant Attorney *934 General, Phoenix, Attorneys for Plaintiff-Appellee, Cross-Appellant.
Bryan Cave, LLP By Steven A. Hirsch, Rodney W. Ott, Phoenix, Attorneys for Defendants-Appellants, Cross-Appellees.

*933 OPINION
IRVINE, Judge.
¶ 1 American Support Foundation, Inc., RCH Investment Co., Selwyn and Janke Jacobson (collectively "American") appeal from the admission of tax protest materials in a condemnation proceeding to determine the fair market value of commercial property owned by American. American also appeals from an order finding it liable for property taxes on the condemned property. The State cross-appeals from an order that it pay part of the outstanding real property taxes on the condemned property.
¶ 2 We find that the trial court should have excluded the tax protest materials and therefore remand for a new trial. We affirm the trial court's ruling that the State and American are each liable for a portion of the unpaid property taxes on the property, but reverse the order that American reimburse the State for the portion the State is required to pay.

FACTS AND PROCEDURAL HISTORY
¶ 3 American owned a commercial building that it leased to Allied Signal, which made improvements and paid the property taxes. Pursuant to the lease, American was responsible for protesting the annual property tax assessments. To fulfill its obligations under the lease, American hired Property Tax Professionals, Inc. ("PTP"), which filed unsuccessful petitions for review of valuations for tax years 1999, 2000, and 2001. In those petitions, PTP made representations about the property's "full cash value."
¶ 4 On March 15, 2000, the State filed a complaint to condemn the property for a freeway interchange. American filed a motion to prevent the State from introducing evidence relating to tax assessments, tax appeals, or other tax-related valuation data. American argued that the evidence was not relevant to market value for condemnation purposes and the specialized purpose of tax valuations made them unreliable for any other use, citing Arizona Rules of Evidence ("Rule") 402 and 403. Further, American argued that although it had hired PTP to routinely protest tax assessments, American was not otherwise involved in the protests or even aware of statements of value in the appeals.
¶ 5 The State countered that American's opinions of value were admissions against interest within Rule 801(d)(2) and that PTP's statements were those of an agent on a matter within the scope of the agency relationship. The tax protest information was therefore relevant to American's opinion of value.
¶ 6 After a hearing, the trial court granted the motion "as to the assessor's valuation" but denied it as to "statements of value made by" American's agents. Consequently, the jury was given the tax appeal documents for the years 1999, 2000, and 2001 with the assessor's valuation deleted but showing the "owner's opinion of value" for each year as being $1,771,697, $1,428,671 and $1,948,263, respectively.[1]
¶ 7 At trial American contended that the property's fair market value was at least $6 million. It called Paul Johnson, a M.A.I. appraiser, to testify that "full cash value" for tax purposes was not equivalent to market value, especially for commercial property. The State's expert witness, Mark Wirth, appraised the property at $3,550,000 and testified that he did not rely on the assessor's full cash value in determining market value. Throughout the trial the State repeatedly referred to the property tax protests, particularly emphasizing the 2001 protest because it was dated March 28, 2000, less than two weeks after the valuation date of March 15, 2000. The jury found the property's market value to be $3,950,000.
¶ 8 American paid the first half of the 2000 property taxes when they became due in late *935 2000. Because no one had paid the property taxes for the second half of 2000, the trial court prorated the unpaid property taxes between the State and American and ordered a partial payment to the Maricopa County Treasurer. The court also entered judgment for $3,950,000 in favor of American as damages for the taking of its property. American appealed from the judgment. The State cross-appealed.
¶ 9 Pursuant to an Indemnitor's Bond signed by American, the court found that American had agreed to indemnify the State for the unpaid taxes. American appealed from this judgment. We consolidated the two appeals.

DISCUSSION

A. Admissibility of Tax Protest Valuation
¶ 10 When a party challenges evidentiary rulings on appeal, we affirm the trial court's rulings unless we find an abuse of discretion or "legal error and prejudice." Brown v. U.S. Fid. & Guar. Co., 194 Ariz. 85, 88, ¶ 7, 977 P.2d 807, 810 (App.1998). We will not presume prejudice; it "must be evident from the record." Town of Paradise Valley v. Laughlin, 174 Ariz. 484, 487, 851 P.2d 109, 112 (App.1992). Under Rule 401, relevant evidence is that "having any tendency to make the existence of any fact that is of consequence" more or less probable than it would be without the evidence. Even if the evidence is relevant, a court may exclude it under Rule 403 if the court finds the probative value is "substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury."
¶ 11 The trial court barred use of the county assessor's valuations but allowed "statements of value made by [American]'s agent or agents." On appeal, American argues that this ruling constitutes reversible error because such evidence is irrelevant, not probative, and confusing to the jury. Further, it contends that the State's emphasis on the tax protest materials in its opening statement, closing argument, and during cross-examination of each witness, as well as questions raised by the jurors, reveal that the evidence influenced the jury.
¶ 12 American maintains that the tax material was not probative and was highly prejudicial because the highest cash value PTP assigned to the property was $1,948,263 for 2001 and even the State's expert agreed that the property was worth substantially more. American also denies that PTP was actually its agent. It argues that an agent acts for the principal's benefit and only Allied Signal would benefit from reduced property taxes because it was responsible for paying all property taxes. The State responds that the trial court properly admitted PTP's statements of value, citing the reasons it argued below. The State further argues that even if admission of the tax appeals documents was error, no prejudice can be shown because the jury verdict was within the range of possible verdicts as established by the testimony of the two experts.
¶ 13 Most courts exclude tax assessment information in condemnation cases because of its potential unreliability and the narrow purpose of tax valuations. See, e.g., 5 Julius L. Sackman, Nichols on Eminent Domain § 22.1 (Matthew Bender & Co. rev.3d ed.2003) [hereinafter Nichols]; C.C. Marvel, Annotation, Valuation for Taxation Purposes as Admissible to Show Value for Other Purposes, 39 A.L.R.2d 209 (1955, Later Case Serv.1989 & Supp. March 2004). Other reasons for excluding tax assessments include the varied qualifications of assessors, the assessments are hearsay not subject to cross-examination, and taxpayers are unlikely to challenge assessments if they understate market value. State v. 45,621 Square Feet of Land, 475 P.2d 553, 557 (Alaska 1970). See also Nichols § 22.1 at 22-6 n.2; Marvel, Annot., 39 A.L.R.2d at 211-24.
¶ 14 Perhaps most significantly for purposes of the analysis in this case, "it is an open secret that the [tax] assessment [value] rarely approaches the true market value." Nichols § 22.1, at 22-10. Thus, a property with a true market value of $1,000,000 may be valued for tax purposes at only $500,000. The property owner is unlikely to complain about the lower value even if the owner believes that the true market value is much *936 higher. Indeed, the lower value may be appropriate for tax purposes if comparable $1,000,000 properties are also valued at $500,000 because the tax burden will be fairly divided between similarly situated property owners based on relative values, not true market values.
¶ 15 We followed this general rule in Jackson v. Pressnell, 19 Ariz.App. 221, 222, 506 P.2d 261, 262 (1973), in which we held that "even though the tax assessors' records may be prima facie evidence of the facts therein stated, they are not admissible in all cases regardless of their relevancy, competency or materiality." The opinion noted that the courts have found a disparity in property valuations in "too many cases" to find assessors' valuations per se admissible on fair market value. Id. In effect, we agreed with the majority rule that values used for property tax purposes are often so unrelated to true market value as to be irrelevant.
¶ 16 This case presents a slightly different issue. The evidence admitted is not the tax assessor's opinion of value, but an opinion used in the tax protest process that is represented to be that of the property owners. Such evidence has often been received in evidence as an admission by the owners or to contradict the owner's testimony as to value. See, e.g., cases cited in Marvel, Annot., 39 A.L.R.2d at 230-39. Because the owner is actually involved in preparing the valuation, its use as evidence is regarded as more reliable and cross-examining the owner with his own statements is considered to be fair.
¶ 17 Nevertheless, some courts have concluded that the purposes and procedures involved in valuing property for tax purposes are sufficiently different from those involved in condemnation disputes that an owner's opinion as to tax value should still be excluded. See Holman v. Papio-Missouri River Natural Res. Dist., 246 Neb. 787, 523 N.W.2d 510, 517 (1994). The rationale for barring such evidence is that a property owner should not be penalized in a condemnation action for expressing an opinion about a fair tax value when the different systems do not justify fair comparison. See Wray v. Knoxville, LaFollette & Jellico R.R. Co., 113 Tenn. 544, 82 S.W. 471, 475 (1904) ("This court knows judicially and as a part of the financial history of the State that land is never assessed for purposes of taxation at its real cash market value, though that may be the law...."). To use the example mentioned above of the $1,000,000 property with a tax value of $500,000, a property owner could reasonably assert that the tax value should be $400,000 if comparable $1,000,000 properties are assessed for tax purposes at $400,000.
¶ 18 The State argues that this reasoning does not apply in Arizona because property is valued for tax purposes using "full cash value," which is synonymous with "market value," citing Arizona Revised Statutes ("A.R.S.") section 42-11001(5) (1999 & Supp.2004), and Golder v. Department of Revenue, 123 Ariz. 260, 599 P.2d 216 (1979). The statute states, in pertinent part:
"Full cash value" for property tax purposes means the value determined as prescribed by statute. If no statutory method is prescribed, full cash value is synonymous with market value which means the estimate of value that is derived annually be using standard appraisal methods and techniques.
Although A.R.S. § 42-11001(5) does, as Golder states, seem to equate "full cash value" with "market value," the tax code itself reflects the legislature's recognition that market value for tax purposes is calculated independently from market value for other purposes.
¶ 19 In some circumstances, the legislature has prescribed a distinct statutory method of valuation. A.R.S. § 42-11001(5).[2] *937 Even when such methods are not used, the legislature has given the Arizona Department of Revenue the authority to prescribe its own guidelines for applying standard appraisal methods and techniques in property tax proceedings. A.R.S. § 42-11054(A)(1). The legislature has also required that "[i]n applying prescribed standard appraisal methods and techniques, current usage shall be included in the formula for reaching a determination of full cash value." A.R.S. § 42-11054(B). In contrast, in a condemnation action property must be valued at its highest and best use. City of Phoenix v. Wilson, 200 Ariz. 2, 6, ¶ 8, 21 P.3d 388, 392 (2001).[3]
¶ 20 The record does not show that any special tax valuation methods applied to American's property or that its current use was not its highest and best use. Nevertheless, the cited provisions in the tax statutes show that section 42-11001(5) cannot be interpreted to mechanically equate tax value with non-tax value. Therefore, we cannot assume that a valuation prepared solely for tax purposes is intended to equal true market value. Equally, we cannot simply assume that when PTP listed full cash value on the tax protests it intended that number to reflect the true market value of American's property. As with the valuations set by the tax assessors, which are plainly not admissible, the distinct purposes and processes of the property tax system make valuations prepared for that system unreliable for other purposes.
¶ 21 A recent decision by our supreme court illustrates that setting tax values involves numerous considerations beyond the market value of the particular property. In Aileen H. Char Life Interest v. Maricopa County, 208 Ariz. 286, 93 P.3d 486 (2004), a group of property owners claimed that their multi-family residential properties were valued in a discriminatory manner, citing the uniformity clause of the Arizona Constitution. See Ariz. Const. art. IX, § 1 ("[A]ll taxes shall be uniform upon the same class of property within the territorial limits of the authority levying the tax."). The disparity was created in part by the assessor's policy of freezing the valuation of certain properties under certain circumstances. 208 Ariz. at 290, ¶ 3, 93 P.3d at 490.[4] The taxpayers were able to show that similar "properties were valued [by the county assessor] at sixty-six percent of full cash value while the Taxpayers' properties were valued at one hundred percent of full cash value." Id. at 296, ¶ 27, 93 P.3d at 496.[5] The court found this evidence sufficient to establish discriminatory tax enforcement, id. at 296, ¶ 30, 93 P.3d at 496, so the property owners were entitled to pay taxes based on the lower values. Id. at 298, ¶ 34, 93 P.3d at 498. The court also noted that the assessor used only the cost approach method to determine "full cash value" and "apparently regarded the cost method as being a standard appraisal technique and thus in compliance with the statutory requirement" of A.R.S. § 42-11001(5). Id. at 295, n.10, 93 P.3d at 495. The taxpayer did not dispute the use of the cost method.
¶ 22 Aileen H. Char shows several things. First, properties may be, and often are, valued at less than full cash value by the assessor.[6] Second, a taxpayer may legitimately *938 argue for a lower "tax" value for reasons unrelated to the actual value of the property, i.e., the lower tax values of other properties. Third, the assessor may value properties using only a particular method, in that case the cost method, without using the whole range of valuation methods generally used in condemnation actions.[7] These factors show that although tax valuation continues to be characterized as using market value, the methods and procedures actually used for taxation are different from those used for other purposes.
¶ 23 In light of this, we agree with American that the tax protest documents should not have been admitted. No evidence was introduced to show that the values shown on the tax protests were prepared to reflect market value for purposes of eminent domain proceedings. Indeed, the State has never claimed that the value listed in the tax protests reflected the actual value of the property. At oral argument the State candidly admitted that its purpose in introducing the tax appeals documents was to expand the range of possible values, particularly by showing that the range was greater than even the State's expert thought. In other words, if the jury was inclined to find a value by splitting the difference between the values presented by the other evidence, the State wanted the bottom of the range to be lower than the value that the State's own expert represented to the court as being accurate. This may be good trial strategy, but it has little to do with fulfilling the constitutional policy of paying "just compensation" to the person whose property has been taken by eminent domain. See City of Phoenix v. Wilson, 200 Ariz. at 5, ¶ 8, 21 P.3d at 391 ("The Arizona Constitution mandates payment of just compensation when the state takes land by eminent domain."). Admissible evidence must make the jury's determination of market value "more probable or less probable than it would be without the evidence." Ariz. R. Evid. 401. The tax protest materials offered here fail that test.
¶ 24 We also conclude that the tax protest documents had little value for impeachment purposes. Although PTP was authorized to act for American, the record plainly shows that the opinion as to value included on the protests was not prepared by American, nor did any of American's owners or managers even know about their preparation. The agreement between PTP and American expressly provided that PTP would "have the sole right to determine the extent to which it is appropriate to pursue an administrative appeal, and to determine which arguments shall be advanced in any such appeal." Impeaching a party with inconsistent statements is generally allowed, see Hernandez v. State, 203 Ariz. 196, 199, ¶ 13, 52 P.3d 765, 768 (2002), but the evidence must still be relevant and probative. Id. at 200, ¶ 15, 52 P.3d at 769 ("Thus, impeachment evidence must be relevant under Rules 401 and 402, and unfair prejudice must not substantially outweigh its probative value."). Here, there is no evidence that American itself used different values for different purposes. See id. at 199, ¶ 14, 52 P.3d at 768 (describing the purpose of introducing evidence solely for impeachment as "hold[ing] parties accountable for setting forth one version of the facts [for one purpose] and describing another version at trial").
¶ 25 We do not believe State ex rel. Morrison v. Jay Six Cattle Co., 88 Ariz. 97, 353 P.2d 185 (1960) requires a different conclusion. In that case our supreme court held that an appraisal report prepared for a property owner for federal tax purposes would be "inadmissible as a hearsay document insofar as it is offered as independent evidence of value" in a condemnation action, but because the report had "slight probative force" the preparer could be cross-examined about its content. Id. at 105-06, 353 P.2d at 190-91. The record showed, however, that the appraisal was prepared based on specific instructions *939 given by the property owner and the appraiser actually testified before the jury regarding the value of the property. In contrast, here it was undisputed that the property owners played no role in the preparation of the tax protests. Moreover, there was no evidence showing that the values contained in the tax protests were prepared using valuation methods appropriate to non-tax cases. Thus, even the slight probative force that was present in Jay Six is not present here.
¶ 26 By holding that the tax protest information should have been excluded we are not adopting a per se rule that completely bars the use of such information. A trial court will have discretion to allow the introduction in condemnation cases of valuations used in tax protests if the proponent of the information can show that the valuations were prepared to show market value as that term is used in condemnation actions or actually reflects the owner's opinion as to market value for non-tax purposes. Neither showing was made here.
¶ 27 Finally, we reject the State's argument that the error does not require reversal because the value picked by the jury ($3,950,000) was "within the range of value that the expert testimony had established." See Town of Paradise Valley, 174 Ariz. at 487, 851 P.2d at 112; see also City of Tucson v. Gastelum, 25 Ariz.App. 127, 129, 541 P.2d 590, 592 (1975) (court should uphold verdict if the jury fixed a reasonable condemnation value, not testified to by any single witness but between the highest and lowest amounts). Both experts testified that the tax protests were irrelevant to determining market value in condemnation proceedings. Nevertheless, we cannot accept the State's assertion on appeal that the jury simply ignored the tax appeal documents that the State repeatedly brought to its attention. The State's purpose in introducing the evidence was to expand the range itself, not to affect where within the range the jury should pick. By significantly and improperly expanding the range, the State removed the difference between the experts as a reliable indicator of the actual range of values that can result from applying accepted methods of valuation. Therefore, we reverse the judgment and remand for a new trial.

B. Liability for Unpaid Property Taxes
¶ 28 Each party argues that Arizona law requires the other to pay the property taxes attributable to the portion of 2000 after the State took possession of the property. Proper interpretation of statutes is a question of law that we review de novo. Citibank (Arizona) v. Van Velzer, 194 Ariz. 358, 359, ¶ 5, 982 P.2d 833, 834 (App.1998).
¶ 29 The condemnation complaint filed March 15, 2000, named the Maricopa County Treasurer ("County") as a party. The County's Answer to the complaint stated that "taxes (in an unascertained amount will be determined at the time of trial) constitutes [sic] liens in favor of the State of Arizona against the real property" and asked that any interest claimed by the Department of Transportation be inferior to the lien for taxes.
¶ 30 The County levied taxes on the property on August 21, 2000, and payments were due October 1, 2000 and March 1, 2001. See A.R.S. §§ 42-17151(A) (1999), 42-18052(A) (1999 & Supp.2003). American paid the first installment in October, but no one paid the March installment. Section 12-1123(D) (2003) provides that condemned properties become tax exempt when the order for immediate possession is recorded and "any unpaid property taxes that have been levied, including penalties and interest, on the property shall be paid ... pursuant to § 12-1116."
¶ 31 Six months after the condemnation complaint was filed, the trial court entered a stipulated order approved by the State, American and the County allowing the State to take possession of the property. The State deposited a cash bond of $3,450,000 and entered into possession on September 15, 2000. Pursuant to the stipulation, American was allowed to immediately withdraw the full amount of the cash bond. No provision was made for the payment of unpaid property taxes. As a condition to withdrawing the cash bond, American executed an Indemnitor's Bond. The final paragraph of the Indemnitor's Bond stated:

*940 [I]f any individual, ... company, corporation, or governmental agency makes a valid claim against that interest which is represented to be owned by [American], or to that award claimed by [American] by reason of [American]'s claimed interest in said real property, including, but not limited to, the payment of any security interest, liens, taxes or assessments, then [American] agree[s] to hold Indemnitee, State of Arizona, safe and harmless from said claim.
At the subsequent trial, the County did not participate, no one raised the unpaid property taxes as an issue, and the verdict simply found the value of the property to be $3,950,000.
¶ 32 In post-trial proceedings, the parties disputed who was responsible for the unpaid taxes. The State argued that the taxes should be paid from the condemnation award and that by signing the Indemnitor's Bond American agreed to hold the State harmless for payment of any liens, taxes, or assessments. It further noted that the County had signed the order of possession, which had permitted American to withdraw the full amount of the bond without any amount held back for taxes, so that taxes not paid from the condemnation award should be extinguished. American took the position that taxes must be prorated and it was not liable for taxes apportionable to the portion of the tax year after the State obtained possession. The County argued that the full amount of the taxes levied in August 2000 were due from either the State or American, plus interest and penalties for late payment.
¶ 33 The court initially ruled that if American had prepaid taxes for the 2000 tax year, those taxes would be part of American's damages in the condemnation, that "prorated taxes are liquidated," American owed no taxes after the State took possession of the property, and that the property would be exempt from taxes after that date. After the County objected, the court modified this ruling to find that the taxes were a lien not extinguished by the verdict and should be prorated "on equitable principles" unless the Indemnitor's Bond required a different outcome. The State then moved to enforce the Indemnitor's Bond. The trial court agreed that the bond covered the taxes and that American had to reimburse and hold the State harmless for the State's prorated share of the taxes.
¶ 34 The State argues on appeal that the trial court erred in apportioning the unpaid property taxes. It contends that the statutory scheme permits a condemning entity to gain immediate possession by posting a bond to secure ultimate payment of damages and any unpaid property taxes, but that nothing in this scheme requires the State to pay any portion of the still outstanding taxes.
¶ 35 American contends that taxes are assessed against the property, not its owner, and that unpaid taxes are a lien against the property, citing Peabody Coal Co. v. Navajo County, 117 Ariz. 335, 338, 572 P.2d 797, 800 (1977) (owner of real property is not personally liable for real property taxes), disapproved on other grounds by U.S. West Communications v. Ariz. Dep't of Revenue, 199 Ariz. 101, 104, ¶ 11 n. 3, 14 P.3d 292, 295 (2000). It argues that only the State and County had interests in presenting evidence of the outstanding taxes in the condemnation trial, and that no statute expressly requires taxes be paid out of the condemnation proceeds or directs a property owner to pay the unpaid taxes. Finally, American asserts that the County waived its right to collect the tax by failing to offer any evidence at trial and that the court sensibly prorated the taxes based on the parties' periods of possession.
¶ 36 The statutes governing condemnation actions plainly intend for property taxes to be paid during the process. First, when a bond is set to allow the State to acquire immediate possession the deposited funds will be held to pay unpaid property taxes. A.R.S. § 12-1116(H), (I), and (J) (2003 & Supp.2004). Second, as a safeguard against overpaying the defendant by overestimating the final damages when the bond is set, if the owner withdraws the bond and the funds disbursed exceed the ultimate condemnation award and any unpaid property taxes, the owner must immediately "repay to the plaintiff the excess ... except that the amount that is necessary to pay any unpaid property taxes ... shall be paid to the county treasurer." A.R.S. § 12-1116(N). Next, when payments *941 for compensation and damages are made to the defendant or deposited in court for distribution to the defendant, the statute requires that all unpaid property taxes shall be paid. A.R.S. § 12-1124 (2003). Finally, a final order of condemnation will only be entered if all unpaid property taxes have been paid. A.R.S. § 12-1126 (2003).
¶ 37 While the timing of payment and who must pay are not definitely identified by these statutes, we conclude that the legislature clearly expressed the requirement that the taxes must be paid before the condemnation can be final. When taxes were levied in August 2000, the amount of tax due became fixed. See A.R.S. § 42-17151 (taxes are levied third Monday in August each year). An inchoate lien for the 2000 property taxes arose on January 1, 2000. See Forum Dev. v. Dep't of Revenue, 192 Ariz. 90, 93-94, 961 P.2d 1038, 1041-42 (App.1997). The lien for the 2000 taxes was not extinguished or abated by the State's taking of the property, and the property became tax exempt only for the 2001 and future tax rolls. See A.R.S. §§ 12-1123(D) (2003) (tax exempt only for future tax rolls), 42-17153(B), (C) (1999 & Supp.2003) (property tax lien attaches January 1, and any lien for unpaid taxes is not abated, extinguished, discharged or merged unless the county board of supervisors approves).
¶ 38 By expressly providing that levied taxes must be paid, the legislature recognized that local governments base their budgets and set their tax rates in reliance on the aggregate values of the properties on the tax rolls at the time of levy in August of each year. A.R.S. § 42-17151. Nonpayment of levied taxes on properties that become tax exempt directly reduces the revenues of the local governments because it is difficult to recalculate the tax levies to account for the lower aggregate valuations.[8] By specifically providing that levied taxes must be paid, the legislature has reduced the potential effects on the local governments that calculated their tax rates based on the inclusion of the condemned property on the tax rolls.
¶ 39 For similar reasons, we reject the argument that the County waived the taxes by signing the stipulation or not appearing at trial. The County appeared in the action and asserted that taxes were unpaid. The amount of the taxes was readily ascertainable given that the property's value and the tax rate were set in August. Although the better practice would have been for all the parties to ensure that the taxes for 2000 were paid at the time the State acquired immediate possession, thus avoiding penalties and interest, the statutes do not require them to do so. Whatever the County did or did not do, A.R.S. § 12-1126 unequivocally requires that all unpaid property taxes be paid before a final order of condemnation is entered. The parties could not avoid this requirement merely because the County signed the stipulation allowing the withdrawal of the bond and failed to participate at trial. The plain language of the statutes was enough to protect the County's interests. Therefore, the trial court correctly held that the taxes must be paid.
¶ 40 This leads us to the dispute between the State and American as to which one of them is liable for the taxes. In a typical real estate transaction between private persons, the buyer and seller may agree to prorate the taxes according to each party's respective time of possession. But no statute commands that result or requires the County to issue separate tax bills to the buyer and seller. The amount of the 2000 taxes due became a fixed liability in August, before the State took possession. Nevertheless, American contends that the taxes are a lien only against the property and if unpaid may be collected only through a foreclosure sale against the State's interest in the property. See generally A.R.S. §§ 42-18104 to -18126 (1999 & Supp.2003). This is certainly true in a typical property sale in which the new owner will pay any unpaid taxes to avoid a *942 cloud on the property's title, but it does not determine how the taxes should be allocated in a condemnation action.
¶ 41 The State argues that the legislature intended that unpaid property taxes be paid by the owner when the government acquires private property, citing A.R.S. § 37-804(A) (2003). This statute governs public lands and permits the State or other governmental instrumentality to require the owner of condemned property "to provide sufficient funds to pay to the county treasurer any taxes on the property that were unpaid as of the date of acquisition." The statute also provides that the lien for unpaid delinquent taxes "is not abated, extinguished, discharged or merged in the title to the property." A.R.S. § 37-804(B). The parties dispute the applicability of this statute to this case, but it reveals a legislative intent to require a private landowner to pay unpaid property taxes even if the government later acquires the property. We do not believe, however, that it applies to the facts of this case.
¶ 42 Unlike the more specific statutes addressing condemnation that refer to paying taxes that have been "levied" at the date of acquisition, A.R.S. § 37-804 refers to taxes that are "unpaid" or "delinquent." When the State acquired possession of American's property the 2000 taxes were not yet due, much less delinquent. Section 37-804 generally protects the State against having to pay the debts of a prior owner of condemned property, but it does not determine who is liable for the taxes attributable to the period after the condemning authority takes the property.
¶ 43 Although the parties debate the meaning of the tax statutes and the application of equitable principles to condemnation actions, we believe the resolution of this issue rests on the basic condemnation concept of paying the property owner "just compensation" that is measured by "the amount of money necessary to put the property owner in as good a financial position as if the property had not been taken." City of Phoenix v. Wilson, 200 Ariz. at 5, ¶ 8, 21 P.3d at 391. One of the trial court's early rulings on the unpaid taxes issue concluded that "[i]f the property owner had prepaid taxes for September 12 and thereafter, those taxes would be part of the property owner's damages." We agree with this conclusion and believe it describes the proper framework for our analysis of which party should pay the unpaid taxes.
¶ 44 American does not dispute that it is liable for the taxes for the portion of 2000 that it actually occupied the property, but argues that the State should pay the taxes for the period after it took possession. The State took the property for the portion of 2000 beginning September 15, so American received no benefit for any taxes paid for that portion of the year. Therefore, if American had paid all taxes due for 2000 immediately after they were levied in August 2000, it would be entitled to claim damages for the prepaid taxes. If American had acquired a new property of equal value on the day the State took its former property, it would certainly have been apportioned or otherwise charged for taxes due for the latter portion of 2000. Equally, to place American "in as good a financial position as if the property had not been taken," id., its damages will include an amount equal to the lost benefit of any prepaid taxes.
¶ 45 Of course, because the taxes were due in two installments in October 2000 and March 2001, the taxes were not prepaid. Nevertheless, we see no reason why the analysis and result should not be the same. This is not a question of apportioning the tax liability. As discussed above, the statutes do not address apportionment and from the tax authority's perspective it does not matter who actually writes the check because the property itself is security for the unpaid taxes. The real question is how the tax liability fits into the system of providing "just compensation" to the owner of the condemned property. To this end, American can claim damages against the State if it pays taxes attributable to the period after the State took the property. Conversely, if the State pays the taxes, American is not damaged and cannot claim compensation.
¶ 46 Accordingly, we affirm the trial court's ruling that American is not liable for the taxes to the extent they are attributable to the period after the State took possession. In this case, the trial court properly ordered *943 American's share of the taxes to be paid out of the award because the award constitutes American's funds. The State was properly ordered to pay the remaining unpaid taxes.[9]
¶ 47 We do not believe American's signing of the Indemnitor's Bond requiring it to reimburse the State for the unpaid taxes changes this result. The Bond addresses the possibility that in addition to paying the owner the value of the property the State will have to pay a property owner's debt that attaches to the property. For example, a federal tax lien that was unknown to the State when it paid compensation to an owner may later be asserted to cloud the State's title to a property. Here, however, because the taxes in dispute relate to the period after the State acquired possession, and American may assert a valid claim for damages against the State to the extent it did pay or is required to pay the taxes, the taxes are not actually American's debt. For the Bond to apply in this case it would have to be interpreted as a waiver of a portion of American's claim to "just compensation," and we do not believe its terms can be stretched so far. Therefore, we reverse the trial court's determination that the Bond requires American to reimburse the State.

CONCLUSION
¶ 48 We reverse the judgment finding the value of the property and remand for a new trial. We affirm the judgment finding American not liable for property taxes after the State entered possession and reverse the determination that American must reimburse the State for any unpaid 2000 taxes the State must pay.
CONCURRING: SUSAN A. EHRLICH, Judge and LAWRENCE F. WINTHROP, Judge.
NOTES
[1] The record includes the assessor's valuation only for 2001. For that year it was $2,435,389. This information was not given to the jury.
[2] See A.R.S. §§ 42-13101 through 42-13104 (agricultural property); §§ 42-13151 through 42-13154 (golf courses); §§ 42-13201 through 42-13207 (shopping centers); § 42-14105 (producing oil, gas and geothermal interests); § 42-14154 (utility companies); § 42-14204 (pipelines); § 42-14254 (flight property); § 42-14355 (railroads); § 42-14403 (telecommunications companies); § 42-14503 (airport fuel delivery companies). See also Business Realty of Ariz., Inc. v. Maricopa County, 181 Ariz. 551, 554, 892 P.2d 1340, 1343 (1995) ("The Arizona Legislature has rarely used its power to prescribe an alternative to the fair market value concept of full cash value for tax valuation purposes.").
[3] The difference between current usage and highest and best use may lead to dramatically different values. See Golder, 123 Ariz. at 265-66, 599 P.2d at 221-22 (noting that when land is used for agricultural purposes in the middle of urban growth, "the agricultural user is taxed only to the extent that the land has value for agricultural purposes").
[4] In some cases the county assessor is given express authority to freeze values. See A.R.S. § 42-13052 (1999 & Supp.2003) (For certain properties the assessor may use the same valuation for up to three consecutive tax years.).
[5] The court cited several other cases in which the assessors valued properties at below full cash value. Id. at 294-95, 93 P.3d at 494-95, citing S. Pac. Co. v. Cochise County, 92 Ariz. 395, 398, 377 P.2d 770, 772 (1963) (Taxpayer asserted that his properties were assessed at not less than eighty-nine percent of full cash value but comparable properties were assessed at no more than twenty percent on average.); McCluskey v. Sparks, 80 Ariz. 15, 18, 291 P.2d 791, 792 (1955) (alleging that other properties were valued at from five to forty percent of full cash value). See also Jackson, 19 Ariz.App. at 222, 506 P.2d at 262 (noting the disparity in valuations).
[6] The continuing disparity between tax values and market values is plainly shown by American's own property. The county assessor's 2001 full cash value for the property was $2,435,389, yet even the State's appraiser put its market value much higher at $3,550,000.
[7] Similarly, a taxpayer may challenge an assessment using only select methods. In this case, the tax appeal forms submitted by PTP included check-off boxes for the method of valuation used by the taxpayer. One year PTP checked "market" and "income;" the next year only "market;" and the third year "market" and "cost." No evidence was introduced explaining the differences.
[8] Changes to the tax rate have been ordered after the third Monday of August, but such changes are difficult because delays in fixing the tax rate after the third Monday in August may actually interfere with taxpayers' rights. Maricopa County v. Garfield, 109 Ariz. 503, 504, 513 P.2d 932, 933 (1973); see also Op. Ariz. Att'y Gen. I90-079; Op. Ariz. Att'y Gen. I80-130. A delay may also interfere with the tax collector's ability to collect the first installment of taxes that is due and payable October 1. A.R.S. § 42-18052 (1999 & Supp.2003).
[9] Although determination of the amount of damages is generally a fact issue that we would leave for trial, neither party disputes the amount of the taxes or the date the State took possession of the property. Therefore, we agree with the trial court that in this case the division of taxes is an issue involving a liquidated amount that the trial court can summarily determine as a matter of law.